UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND ANDERSON, RALPH BROWN,
EARL LARDNER, JAMES LARDNER, ANTON
WOLF and RICHARD WRIGHT,                          Case No. 11-10200

               Plaintiffs,

                                      Paul D. Borman
v.                                                United States District Judge

                                      Mark A. Randon
OTIS ELEVATOR COMPANY,                            United States Magistrate
                                      Judge
a foreign Corporation,

               Defendant.
_____/

OPINION AND ORDER (1) GRANTING DEFENDANT'S MOTION TO STRIKE EXHIBIT U
TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND (2) DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR SPOLIATION

      This matter is before the Court on Defendant's Motion to Strike Exhibit U to Plaintiffs'

Response to Defendant's Motion for Summary Judgment (ECF No. 90) and Plaintiffs' Motion for

Spoliation (ECF No. 63).  The Court held a hearing on October 11, 2012.  For the reasons that

follow, the Court GRANTS Defendant's motion to strike and DENIES WITHOUT PREJUDICE

Plaintiffs' motion for spoliation.

**INTRODUCTION**

      This action involves claims of age and race discrimination by six individuals who were

employed as mechanics by Defendant Otis Elevator Company ("Otis") and were terminated in 2008-

2009.  Otis claims that the terminations were part of a broader workforce reduction necessitated by

economic conditions and were unrelated to the Plaintiffs' age and/or race.  Presently before the

Court are (1) Otis' Motion to Strike Exhibit U, a purported Federal Rule of Evidence 1006 Summary that Plaintiffs have offered in support of their response to Defendant's pending motion for summary judgment, which is scheduled to be heard separately at a later date,  and (2) Plaintiffs' Motion for Spoliation.

## I.      BACKGROUND

Plaintiffs in this action are six former Elevator Journeymen Mechanics who worked for Otis and were laid off by Otis between December, 2008 and December, 2009.  Plaintiff Ray Anderson is African American and was born in 1956.  Plaintiff Ralph Brown is Caucasian and was born in 1958.  Plaintiff Earl Lardner is Caucasian and was born in 1952.  Plaintiff James Lardner is Caucasian and was born in 1956.  Plaintiff Tony Wolf is Caucasian and was born in 1956.  Plaintiff Richard Wright is African American and was born in 1950.  Plaintiffs contend that they were terminated and replaced by younger workers and treated disparately compared to younger workers.  Anderson and Wright additionally allege that were discriminated against because they are African American.

Otis responds that it laid off 17 of its 53 mechanics in the relevant time period as part of a workforce reduction, including the six Plaintiffs in this action, each of whom, Otis maintains, was among the lowest performing mechanics when terminated.  Otis further responds that neither race nor age was a consideration in the decision to layoff the six Plaintiffs.

Currently pending before the Court are Defendant's Motion for Summary Judgment, Defendant's Motion to Strike Exhibit U Offered in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment, and Plaintiffs' Motion for Spoliation.  In the instant Order, the Court will address the motion to strike and the motion for spoliation.  The Motion for Summary

Judgment is scheduled to be heard on December 12, 2012 and will be addressed in a separate order.

## II.   ANALYSIS

### A.   Defendant's Motion to Strike Exhibit U

Otis moves to strike Exhibit U to Plaintiffs' response to Otis' motion for summary judgment. Exhibit U is a Declaration of Plaintiffs' lead counsel, Marcie Brault, that attaches several spreadsheets created by Ms. Brault and is offered as a summary of voluminous evidence under Federal Rule of Evidence 1006.  Otis argues that Exhibit U is not an accurate, non-prejudicial summary of voluminous evidence but rather is improper attorney argument offered by Plaintiffs' lead counsel who is, in any event, an improper proponent of such an exhibit under the code of professional conduct.

#### 1.   The "Rack and Stack," FAPEs and the creation of Exhibit U.

In selecting the six Plaintiffs for layoff, Otis purports to have relied, in part, on a ranking system, the Field Associate Ranking, colloquially referred to as the "Rack and Stack," which was created to compare employee performance based on a pre-selected set of objective criteria to evaluate the workforce for possible layoffs.  (ECF No. 93-2, Sealed Exhibit 7 to Def.'s Resp. to Mot. for Spoliation.)  The Rack and Stack was created in part based upon information reported on employee performance evaluations, Field Associate Performance Evaluations ("FAPEs"). (ECF No. 92-6, Def.'s Resp. to Mot. for Spoliation Ex. 5.)

The FAPEs are prepared by supervisors to rate the performance of individual employees, scoring the employee on any given factor by assigning the employee a competency level (unsatisfactory, low/limited, medium and strong (or not applicable)) on a pre-selected set of factors. For the most part, the performance factors considered by supervisors completing a FAPE, i.e. safety,

ethics, focus on customer needs, customer relationship building, technical expertise, productivity, work quality, attitude, applying standard processes, dependability/reliability, communication, problem solving, results oriented, planning and organization, leveraging networks, troubleshooting skills, repair skills and availability for callbacks, are the same factors considered on the Rack and Stack.

On the Rack and Stack, the competency levels utilized on the FAPEs are assigned numbers: 1- unsatisfactory, 2 - low/limited, 3 - medium, and 4 - strong.  Additionally, on the Rack and Stack, the factors are weighted, i.e. given a rating from 1-5, 1 - desired, 2 - encouraged, 3 - important, 4 - necessary and 5 - critical, corresponding to the criticality of each of the listed factors.   The competency number assigned for a given factor is multiplied by the weight assigned to that factor and the sum of those values is the total point number assigned to a given employee on the Rack and Stack.  The pre-weighted Rack and Stack values for any given employee were supposed to closely track, although not necessarily mirror exactly, the competency levels assigned on the FAPEs. Employees scoring the lowest total points were generally selected first for work force reduction layoffs, although other considerations, such as a customer request or a specialized skill, could trump the Rack and Stack order in certain circumstances.

Plaintiffs contend that the Rack and Stack was somehow "rigged" against them because the Rack and Stack values did not, in every case, exactly mirror the competency levels on each employee's FAPE.  Plaintiffs claim that the disparity between the FAPE values and the Rack and Stack point totals are demonstrably the greatest among older employees, including the Plaintiffs. Plaintiffs attempt to demonstrate this disparity in Exhibit U to their motion for summary judgment, which is the subject of the instant motion to strike.

4

Exhibit U was prepared by Plaintiffs' lead counsel, Darcie Brault, and is offered as evidence pursuant to Federal Rule of Evidence1006, which permits accurate and non-prejudicial summaries of voluminous evidence, i.e. evidence that is so voluminous that it cannot conveniently be examined in court, to be admitted to prove the content of the underlying data under certain circumstances. (ECF No. 84, Sealed Exhibit U.) Ms. Brault explains in her Declaration in Exhibit U that she reviewed the FAPEs and the 2009 Rack and Stack and found that the numbers did not match up. Then, "in order to compare the voluminous documents," she prepared her own spreadsheet. (ECF no. 84, Exhibit U, Brault Decl. ¶ 4.) She added employee birth dates to the spread sheet and gathered all FAPEs that had been produced and pulled those for years 2007-2009, many of which were missing. *Id.* ¶¶ 7-8. Although many of the FAPEs were not completely filled out, i.e. not every performance factor was rated for every employee, Ms. Brault filled in those values that she had, weighted the FAPE values to correspond to the Rack and Stack values, and totaled the weighted FAPE scores for each employee on the grid. *Id.* at ¶¶ 9-11. Next, Ms. Brault explains, for each employee for whom she "had sufficient data," i.e. a Rack and Stack score and a fully completed 2008 or 2009 FAPE, she calculated the disparity between the FAPE as weighted and the 2009 Rack and Stack. *Id.* ¶ 13. Next, she placed the disparity for each employee next to that employee's birth date, excluding any employee for whom she had "incomplete" information. *Id.* ¶ 14. Ms. Brault then notes in her Declaration that the largest disparities were for Kerry Kimlin (she later corrects this), Plaintiff Earl Lardner, Plaintiff Ralph Brown, and Plaintiff Ray Anderson. Ms. Brault notes that Plaintiff Richard Wright was within the top nine of the "most disparate scorers." *Id.* ¶ 16. Plaintiffs then argue, based upon Exhibit U, that the Rack and Stacks were modified or rigged to disproportionately qualify older employees for layoff.

2.        **Federal Rule of Evidence 1006:  Summaries to Prove Content**

Federal Rule of Evidence 1006, titled "Summaries to Prove Content," provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court."  Fed. R. Evid. 1006. The decision whether to admit a summary under Federal Rule of Evidence 1006 is committed to the sound discretion of the trial court.  *United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008).   A Rule 1006 Summary is offered and admitted in lieu of the underlying evidence.

To establish the admissibility of a Rule 1006 summary, the proponent has the burden of establishing each of the following factors:

> (1) the underlying documents are so voluminous that they cannot be conveniently examined in court; (2) the underlying documents have been made available for examining or copying at a reasonable time and place; (3) the underlying documents are admissible into evidence; (4) the summary is accurate and nonprejudicial; and (5) the summary [can] be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Stone*, 852 F. Supp. 2d 820, 828 (E.D. Mich. 2012) (citing *United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008)).

Because the summary, as the title of the Rule provides, is admissible to prove its contents, great care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative:

> When a summary is admitted pursuant to Rule 1006, the summary itself becomes substantive evidence for the trier of fact to consider. *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir.1998), citing 2 MCCORMICK ON EVIDENCE § 233; 6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.04[2]. As such, it is especially important that the summary be accurate and nonprejudicial. The Sixth Circuit says the accuracy requirement means that "nothing should be lost in translation," and "the information on the summary is not embellished by or annotated with the conclusions of or inferences drawn by the proponent . . . ." *Id*. Describing the dangers of an inaccurate summary, the Sixth Circuit added that "a summary containing elements

6

of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations . . . ." *Id.* Therefore, trial courts must take care that unfair summaries are not presented to juries. *United States v. Scales*, 594 F.2d 558, 564 (6th Cir. 1979); *see also Peat, Inc. v. Vanguard Research, Inc*., 378 F.3d 1154, 1159–60 (11th Cir. 2004) ("And because summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes.") (internal quotation and citation omitted).

*Stone*, 820 F. Supp. 2d at 828.

Because the summary itself under Rule 1006, and not the underlying evidence, is the material to be considered by the jury, there cannot be any hint or suggestion in the summary of a conclusion that the party proffering the summary hopes the jury will reach on some disputed issue of fact. "Such summaries or charts admitted *as evidence* under Rule 1006 are to be distinguished from summaries or charts used as pedagogical devices which organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence.  Such pedagogical devices 'are more akin to argument than evidence . . . .'" *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998) (quoting *Gomez v. Great Lakes Steel Div. Nat'l Corp*., 803 F.2d 250, 257-58 (6th Cir. 1986)) (emphasis in original).

Examining proposed Exhibit U with these guidelines in mind, it becomes apparent that proposed Exhibit U prohibitively migrates into pedagogical territory.  First, the "voluminous" documents that Plaintiffs purport to summarize are  "approximately half of the[] FAPEs" that were produced by Otis in discovery, which amounted to "approximately 350 pages of documents."  (ECF No. 98, Pls.'s Resp. to Mot. to Strike 4.)  But Exhibit U is not merely a summary of the FAPEs. Exhibit U is an effort to summarize (and to weight) the FAPEs, but only for purposes of comparison to other evidence, which is not voluminous at all.  Exhibit U incorporates evidence from other

7

sources, such as the 2009 Rack and Stack, and a list of employee birth dates, neither of which is voluminous and neither of which requires any summation at all.   The 2009 Rack and Stack and a list of employee birth dates easily can be examined in Court.   Thus, only a portion of the material purportedly summarized in Exhibit U, the 350-some FAPEs, even meets the threshold requirement of voluminousness.

There does not seem to be argument regarding factors two and three, the availability and admissibility of the FAPEs, the 2009 Rack and Stack or the employee birth dates.   The fourth factor, however, accuracy and non-prejudicial presentation of the material summarized, is clearly not satisfied in Exhibit U.  In creating her summary, Ms. Brault attempts to demonstrate that a disparity existed between certain employee's performance evaluation totals and those employee's scores on the 2009 Rack and Stack.   First, Ms. Brault's entire summary and conclusion is based upon her interpretation of the significance of the demonstrated disparity to Plaintiffs' claim that they were laid off because of their age and/or race.   According to Plaintiffs, the FAPEs and the Rack and Stack totals were supposed to "match" in every case.   Thus, by demonstrating that the totals did not match in every case, and by further demonstrating that the disparity was greatest among older employees, Plaintiffs assert that they have undermined the integrity of the Rack and Stack and proved their claim of discrimination.   However, there is disputed testimony on the extent to which the totals on the FAPEs were supposed to correlate with the Rack and Stack totals.   Several witnesses who were present at the Rack and Stack meetings testified that during the Rack and Stack process, deviations from an employee's FAPE totals could occur based upon comments and discussion at the Rack and Stack meetings.

Even putting aside, however, this basic dispute as to the relevance of any demonstrated

disparity, it is clear that in attempting to demonstrate that a disparity exists, and by further comparing that disparity to employees's birth dates, Exhibit U goes far beyond simply summarizing the FAPEs.  First, the data which Ms. Brault selected for inclusion in Exhibit U was inherently incomplete.  Although this may be due to the cards she was dealt through discovery, this does not render the inconsistencies and omissions meaningless in this Rule 1006 analysis.  Ms. Brault concedes that a number of the FAPEs that she used as a basis for her summary were incomplete and did not include a score for each performance factor.  (ECF No. 98, Pls.'s Resp. to Mot. to Strike, Exhibit B, June 6, 2012 Corrected Declaration of Darcie R. Brault ¶ 8.)   Apparently, those employees were therefore not included in Exhibit U, which therefore does not reflect the "disparity," or lack thereof, in some unknown number of instances.  Further, in some instances, she used an employee's 2008 FAPE, and in some instances she used an employee's 2009 FAPE, for comparison to the 2009 Rack and Stack.  For example, Mr. Brault explains that for Plaintiff Earl Lardner, "his 2008 evaluation was not scored for a number of performance factors," which Ms. Brault "indicated by putting "n/e" in the appropriate cell."  *Id*. ¶ 8.  She then apparently used Mr. Lardner's 2009 performance evaluation totals (weighted by her for purposes of the summary) for comparison to the 2009 Rack and Stack totals.  In some instances, however, if she had only the 2008 performance evaluation, she compared those totals to the 2009 Rack and Stack.  *Id*. ¶ 12.

Even forgiving these potential inaccuracies in the FAPE summaries, by offering a further comparison of the FAPE and Rack and Stack disparity to employees' birth dates, suggesting that any disparity is proof of age-based discrimination,  Exhibit U clearly crosses the line between a Rule 1006 summary and a pedagogical device.  In drawing this comparison, and suggesting such conclusions in the proposed summary, Exhibit U is inescapably "embellished by . . . the inferences

drawn by the proponent." *Id*. This is not to say that Plaintiffs cannot suggest this inference in argument as a basis for their claim of discrimination. But they cannot submit this conclusion in the form of a Rule 1006 Summary that will be admitted for consideration by a jury as substantive evidence.

Finally, any Rule 1006 summary "must be properly introduced through the testimony of a witness who supervised its preparation." *Stone*, 852 F. Supp. 2d at 828. In this case, Ms. Brault would be the appropriate witness as she alone has testified as to the preparation of Exhibit U, which would require significant explanation as to its preparation before it could be admitted into evidence and submitted to the jury. As the preparer of a Rule 1006 summary, Ms. Brault is subject to cross examination. This places Ms. Brault squarely at risk of violating the advocate-witness rule, which bars a lawyer from acting "as advocate at trial in which the lawyer is likely to be a necessary witness." Michigan Rule of Professional Conduct 3.7. In requiring that a Rule 1006 summary be properly introduced through the testimony of its preparer, Rule 1006 suggests that a summary admitted under that rule "will have been prepared by a witness available for cross-examination, not by the lawyers trying the case." *United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997) (reasoning that Fed. R. Evid. 1006 does not allow for the admission of a summary prepared by a lawyer trying the case that restates and distills other properly admitted exhibits). A summary such as Exhibit U, which is far from self-explanatory and would require significant testimony just to explain its preparation, when prepared by the Plaintiffs' lawyer who presumably will be trying the case, presents potential ethical questions as well.

Much of Plaintiffs' theory of the case appears to rest upon their assertion that the Rack and Stack, which Otis concedes was a significant tool utilized in selecting employees for layoff, did not

mirror the FAPEs and in fact was somehow massaged to disproportionately rank older employees lower than their younger co-workers.  Thus, the Court does not agree with Otis at this summary judgment stage that the FAPEs are wholly irrelevant.  But through Exhibit U, Plaintiffs are not just summarizing one piece of particularly voluminous evidence, but rather are attempting to compile various pieces of evidence, some of which are not voluminous at all, into a summary that demonstrates Plaintiffs' particular view of the evidence.  The "summary" ignores several factors that Defendant claims also were considerations in the final layoff decisions, such as customer requests, the specialized skill of a particular mechanic and business needs.  Otis maintains that the evidence will show that the Rack and Stack was a tool in the layoff process, but was not dispositive.  (ECF No. 92-9, Ex. 8, March 9, 2012 Declaration of Joseph Steger, ¶¶ 16-23.)

Moreover, although the Court is making no findings now as to the sufficiency of any of the evidence offered in the parties' summary judgment briefs, there appears to be conflicting evidence as to whether in every instance the FAPE score would match the Rack and Stack, so that the disparity unearthed by Plaintiffs' comparison of the two may not necessarily lead to the conclusion that the Rack and Stack was modified for some discriminatory purpose by Mr. Steger.  For example, Keith Hearns testified at his deposition that the FAPEs were completed by an individual employee's supervisor and while the FAPE was consulted during the Rack and Stack meeting, changes could be made depending on the opinions of others in attendance at the Rack and Stack, which included "every field manager that has people on the list." (Def.'s Mot. Summ. Judg. Ex. 11, October 4, 2011 Deposition of Keith Payton Hearns, 85.)[1]  Even after the Rack and Stack totals had been compiled,

---

[1] The Court  cites to the Summary Judgment motion exhibits only to demonstrate the shortcomings of Exhibit U as Rule 1006 Summary.  The Court is not making any factual or legal determinations regarding the pending motion for summary judgment, which the Court has not yet fully reviewed

and the comparisons were up on the screen for all to see how each employee "stacked up," witnesses have testified that there could still be changes made if, for example, one manager opined that employee X, although ranked below employee Y, actually had a better attitude or better work quality. Some evidence suggests that if there was enough agreement on such a point among the supervisors in attendance, adjustments would be made then and there. *Id*. at 64-65; 90-92.

All of this leads the Court to conclude that Exhibit U is not an accurate and non-prejudicial summary of particularly voluminous material at all. It is Plaintiffs' final argument wrapped in a document. Not to mention that it is incomplete and more confusing than the underlying data that it purports to summarize. Exhibit U is not properly offered as a Federal Rule of Evidence 1006 summary and the Court GRANTS Defendant's motion to strike Exhibit U from the record.

## B.     Plaintiffs' Motion for Spoliation

Plaintiffs assert that Otis has spoliated evidence and accordingly seek an adverse inference instruction with respect to two categories of evidence that Plaintiffs claim Otis either misplaced or destroyed: (1) documents related to Otis' economic or business necessity for the layoffs; and (2) certain documents related to the Rack and Stack process. Because this action is still in the pre-trial phase, and because Plaintiffs have demonstrated only a suspicion of prejudice and have not been able to establish bad faith conduct on the part of the Defendant, the Court will DENY the motion for spoliation without prejudice to Plaintiffs' right to move for further sanctions at any later appropriate phase of the proceedings.

### 1.     Plaintiffs' claim that Otis misplaced or destroyed evidence.

With respect to the economic basis for the workforce reduction, Plaintiffs assert that Otis

and which is scheduled to be heard separately at a later date.

12

*must have* more than "the three pages of relevant financial/budget documents for the years requested." (ECF No. 63, Pls.' Mot. for Spoliation ¶ 14.) Plaintiffs are dissatisfied with the documents that Otis has produced in response to Plaintiffs' request to produce "budget documents for Otis Elevator Company Detroit/Toledo for the years 2007, 2008, 2009 and 2010, all reports, e.g. monthly reports and year end reports depicting performance to plan and any and all correspondence regarding performance to plan," and to produce "any and all documents which relate to the decision to conduct a workforce reduction in which any plaintiff was laid off." (ECF No. 63, Pls.' Mot. for Spoliation ¶¶ 1-13.) In response to these requests, Otis supplemented its original responses with a summary for the years ended 2007, 2008, 2009 and 2010, setting forth total sales and total service figures comparing year to date actual to year to date plan and demonstrating the variance. (ECF No. 63, Pls.' Mot. Spoliation Ex. G, Detroit GBO Historical Sales Performance (filed under seal ECF No. 65)). After Plaintiffs filed a motion to compel, seeking a more detailed breakdown of the figures represented on Exhibit G, Otis produced the monthly breakdowns, for each of the years 2007-2010, on the summarized data contained in Exhibit G. (ECF No. 63, Pls.' Mot. Spoliation Ex. H (filed under seal ECF No. 66)).

Although the information contained in Exhibits G and H demonstrates the reduction in sales that Otis claims caused it to institute the various reductions in workforce that resulted in Plaintiffs' layoffs, and in spite of Otis' representation that this is the only data on which it intends to rely at trial to prove the economic necessity for its workforce reductions, Plaintiffs insist that there must be more and that Otis must have destroyed the "something more," entitling Plaintiffs to an adverse instruction as to what the "something more" would have demonstrated. Plaintiffs complain that these "performance to plan" exhibits do not contain, and Otis has not produced, "any information

regarding labor costs or profits." (ECF No. 63, Mot. Spoliation ¶ 11.) Plaintiffs assert that it is incredulous that Otis has "no more than three pages of relevant financial/budget documents for the years requested" and "that there is not a single contemporaneous electronic mail message or any other communication between management employees bearing upon the decision(s) to reduce what it claims was a 30% reduction in its workforce." *Id.* ¶ 14.

Plaintiffs filed three motions to compel but none of Magistrate Judge Randon's rulings on those motions, which were never appealed to this Court, expressly required Otis to produce labor costs or profit figures. On February 7, 2012, Magistrate Judge Randon held a hearing on Plaintiffs' third motion to compel. At the hearing, Plaintiffs' counsel conceded that the Otis witnesses had uniformly testified that the reduction in workforce decisions were made based on projected sales figures. (ECF No. 59, Transcript of March 13, 2012 Hearing.) Plaintiffs counsel then asked for the back up monthly reports that the witnesses testified demonstrated a reduction in sales and were relied on in making the decision to order a workforce reduction: "I want the financial information that shows that, and not just the testimony of people who say I think that's the way it was. They said there were monthly reports. That's what we asked for." *Id.* at 14. Magistrate Judge Randon then ordered Otis to produce the monthly reports. *Id.* at 16. In compliance with the Court's Order, Otis produced Exhibit H, which shows performance to plan for each month of the years 2007-2010. There were no further motions to compel by Plaintiffs and no alleged failures on the part of Otis to comply with any Orders of the Court.

Plaintiffs also claim that Otis has either destroyed or failed to produce FAPEs for seven employees, none of whom is a Plaintiff in this case, but each of whom appears among the bottom ten scorers on the 2009 Rack and Stack. These FAPEs also were addressed at the hearing before

14

Magistrate Judge Randon on Plaintiffs' third motion to compel. At the hearing, counsel for Otis represented to the Court that Otis had performed "a diligent search" for the missing seven FAPEs (Otis had already produced 334 FAPEs for the years 2008 and 2009 for Otis' entire Detroit workforce) and that there were no more FAPEs that could be found or were going to be produced. Magistrate Judge Randon accepted this representation, explaining that "all [counsel [had] to do was say that." *Id*. at 18.

Plaintiffs also contend that they have been unable to obtain, from the Excel Rack and Stack spreadsheet produced by Otis, the "metadata" that Plaintiffs claim necessarily would have been retained in connection with that spreadsheet. Although Plaintiffs offer no expert testimony or other evidence on this point, Plaintiffs contend that this "metadata" would have demonstrated when and by whom data was initially entered onto the spreadsheet and thereafter modified. Plaintiffs argue that because Joseph Steger, Otis' Field Operations Manager who was in charge of overseeing and preparing the Rack and Stacks, testified that he did have the ability to change the Rack and Stack after the supervisors met to decide the rankings, this metadata would support their claim that Steger modified the Rack and Stack after the supervisors met. In support of their contention that Otis has spoliated such metadata, Plaintiffs refer the Court to a web address that explains how it is possible to extract hidden metadata from an excel spreadsheet. http://office.microsoft.com/en-us/excel-help/find-and-remove-metadata-hidden-information-in-your-legal-documents-HA001077646.aspx

Plaintiffs claim that they have been unable to extract from the Rack and Stack spreadsheet any "metadata" indicating when or by whom the spreadsheet may have been modified subsequent to the date of the Rack and Stack meeting at which the 2009 Rack and Stack was created. Plaintiffs suggest that Joseph Steger had such metadata on his company computer but lost or destroyed the

data in an alleged "computer crash" in 2011. Steger testified that he was the only individual responsible for finalizing the 2009 Rack and Stack but that he suffered a crash of his company laptop in February, 2011, and was unable to access the Rack and Stack data that had been stored on his computer. Steger testified that he sent his computer to a recovery services company but his emails were never recovered, which is where he saved the Rack and Stack. However, Steger had forwarded a copy of the 2009 Rack and Stack to Elizabeth Ceriello in Otis' labor relations department prior to his computer crash. Ms. Ceriello was able to produce a copy of the 2009 Rack and Stack from her computer, which is the version that was produced to the Plaintiffs. (ECF No. 63, Pls.' Mot. for Spoliation Ex. C, Deposition of Joseph Steger, 100-107.) Plaintiffs have never pursued the "computer crash" further, never sought third party discovery on the issue from the computer recovery company and never sought to recover the allegedly destroyed data from Otis' servers or any other source.[2]

Plaintiffs ask the Court to rule now that it will instruct the jury that it may conclude that Otis failed to produce the metadata and that it may infer from the absence of the metadata that the spreadsheets were changed after the Rack and Stack meetings as argued by Plaintiffs. Plaintiffs further seek an instruction that the withholding of the metadata is evidence that the purported

---

[2] Plaintiffs state that Otis was "ordered" to produce the metadata but the Court is unaware of any direct order specifically regarding "metadata" in any of Magistrate Judge Randon's Orders. Otis did agree to produce the Excel Spreadsheets in their native format, which it appears that they did produce. If Otis had been ordered to produce the "metadata," and are claiming that Steger's computer crash wiped out the metadata, then perhaps Otis had a duty to search its servers or other sources to recover the metadata. If, as it appears, Plaintiffs only requested the Excel spreadsheet in its native format, which they received, then Otis cannot be sanctioned for failing to produce something that was never requested. Again, the Court denies Plaintiffs' spoliation motion without prejudice and remains open to subsequent spoliation argument at any later appropriate time in the proceedings.

business reasons for terminating the Plaintiffs was a pretext for discrimination.  (ECF No. 97, Pls.'
Reply 6-7.)  As discussed below, Plaintiffs have failed to establish their entitlement to this requested
sanction at this time but the Court denies the motion without prejudice, and will permit the issue to
be raised again if further evidence supports the Plaintiffs' request.

### 2.     The availability of sanctions for spoliation of evidence.

To be entitled to an adverse inference instruction based on the destruction of evidence,
Plaintiffs  "must establish: (1) that the party having control over the evidence had an obligation to
preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of
mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a
reasonable trier of fact could find that it would support that claim or defense." *Beaven v. United
States DOJ*, 622 F.3d 540, 553 (6th Cir. 2010) (*quoting Residential Funding Corp. v. DeGeorge Fin.
Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).  A range of sanctions is available to a district court,
depending upon the degree of culpability of the spoliating party:

> "[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was
> destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or
> negligently.' " *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie [v. Town
> of Cromwell, Bd. of Education*], 243 F.3d [93 (2d Cir. 2001)] at 109). When
> appropriate, "a proper spoliation sanction should serve both fairness and punitive
> functions," but its severity should correspond to the district court's finding after a
> "fact-intensive inquiry into a party's degree of fault" under the circumstances,
> including the recognition that a party's degree of fault may " 'rang[e] from innocence
> through the degrees of negligence to intentionality.' " *Adkins [v. Wolever*], 554 F.3d
> [650 (6th Cir. 2009)] at 652-53 (quoting *Welsh v. United States*, 844 F.2d 1239,
> 1246, (6th Cir.1988), overruled on other grounds by *Adkins*, 554 F.3d 650). "Thus,
> a district court could impose many different kinds of sanctions for spoliated
> evidence, including dismissing a case, granting summary judgment, or instructing a
> jury that it may infer a fact based on lost or destroyed evidence." *Id*. at 653 (citing
> *Vodusek [v. Bayliner Marine Corp.*], 71 F.3d [148 (4th Cir. 1995)] at 156).

*Beaven*, 622 F.3d at 554.  "An obligation to preserve may arise when a party should have known that

17

the evidence may be relevant to future litigation, but, if there was no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case and intentional destruction . . . ." *Id*. at 553-54 (internal citations and quotation marks omitted).

With respect to Plaintiffs' allegations regarding the existence of additional documents demonstrating Otis' business necessity for the layoffs, this was the subject of a motion to compel before Magistrate Judge Randon and there is no allegation that Otis has failed to comply with Magistrate Judge Randon's Order.  Otis has produced both annual and monthly sales performance to plan documents for the relevant Detroit market.  Plaintiffs' unsupported "belief" that there must be more cannot sustain their spoliation claim.[3]  Absent some proof, or even a suggestion by some witness, that additional documents in fact did exist, and that Otis failed to produce them, Plaintiffs are unable to establish either that Otis had an obligation to preserve such documents or that Otis destroyed or misplaced the documents with a culpable state of mind, and therefore are not entitled to any adverse instruction at this stage.  Plaintiffs argue that Otis should be precluded at trial from presenting any further documentation in support of its claimed business necessity for the work force reduction pursuant to which Plaintiffs were laid off.  This much Plaintiffs are entitled to but Otis has represented that it does not intend to rely on any further documents at trial on this issue.  If this becomes an issue at some later stage of proceedings, the Court will address further argument at that time.

---

[3] At the hearing on the instant motions, the parties suggested that the issue regarding the allegedly spoliated documents relating to Otis' business necessity for the layoffs relates more directly to a legal presumption to which Defendant may be entitled under *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990).  Apparently, Plaintiffs argue that Otis has not produced sufficient evidence on the issue of business necessity to entitle it to any presumption under *GenCorp*.  The Court has not yet reviewed the summary judgment briefs and expresses no opinion on this issue, dealing here only with the issue of spoliation.

18

With regard to Plaintiffs' assertion that Otis has spoliated the metadata that "must have" existed relating to the 2009 Rack and Stack, again Plaintiffs have failed to establish that such "metadata" in fact did exist, was within Otis' possession and that Otis has withheld it or destroyed it with a culpable state of mind.  Otis undoubtedly had an obligation to preserve any evidence relating to creation of the Rack and Stack as of the date that the document was created, given Steger's testimony that the Rack and Stack was created in part as a shield against liability based on claims of unfairness in the layoff process.  (ECF No. 92, Def.'s Resp. to Spoliation Mot. Ex. 2, Steger Dep. 96.)  However, Plaintiffs have presented no evidence that Otis failed to produce or in fact destroyed this "metadata."  Indeed, Otis did produce the electronic version of the Rack and Stack as maintained by them.

Although Plaintiffs were unable to recover any metadata from the spreadsheet as produced, there is no evidence that Plaintiffs ever pursued the allegedly missing metadata any further.  There is no evidence that Plaintiffs ever sought to examine Otis' servers or any other potential source of the metadata after failing to retrieve the metadata from the Excel spreadsheet produced by Otis.  Nor does it appear that Plaintiffs ever attempted to obtain discovery from the computer recovery company that worked to recover data from Mr. Steger's computer after it crashed.  Plaintiffs offer no forensic evidence that the metadata they seek in fact exists and was deleted from the Rack and Stack spreadsheet as produced to Plaintiffs.  Plaintiffs merely suggest that "the metadata contained in the "rack and stack" spreadsheet may have provided an answer to when the changes were made to the Excel spreadsheet and by whom.  However, the metadata cannot be recovered from Otis' production."  (ECF No. 97, Pls.'s Reply 6.)  Plaintiffs hoped that if they could have recovered metadata that would have indicated when the Rack and Stack was last modified, it may have

19

supported their theory that Mr. Steger modified the Rack and Stack after the Rack and Stack meeting.  Even assuming that the metadata, if it did exist and did demonstrate that the Excel Spreadsheet was modified after the Rack and Stack meeting, might be relevant to Plaintiffs' claim, Plaintiffs have failed to establish beyond speculation either that it did exist or that Otis negligently or intentionally destroyed it.

The Court is required to engage in a "fact intensive" inquiry into the issue of culpability before concluding that a spoliation instruction or other sanction is warranted.  Plaintiffs simply have not met their burden of producing sufficient facts to permit the Court to conclude that Otis acted with a level of culpability with regard to the allegedly missing metadata to justify the sanction of an adverse instruction.  While Plaintiffs would be free to explore this issue with Mr. Steger at a trial, their suspicion that certain metadata, that has never been proved to have existed, might have supported their further suspicion that Mr. Steger modified the Rack and Stack, does not support their request for an adverse instruction at this stage.  Because the Court denies the motion for spoliation without prejudice, Plaintiffs will be free to mount a successive challenge on this basis, and to seek appropriate sanctions, if facts to support their suspicions come to light.

The same is true with respect to the email correspondence that Plaintiffs maintain "must of logic and necessity" exist regarding the Rack and Stack process.  Multiple witnesses testified that they had no recollection of any email correspondence regarding that the Rack and Stack meeting and Plaintiffs have not directed the Court's attention to any testimony that would indicate that this is factually inaccurate.  Again, Plaintiffs have not conducted any forensic exams of Otis' servers that would indicate that such electronic correspondence in fact existed and was deleted.  And there is no evidence that this was the case.  Plaintiffs would be free to cross-examine Otis witnesses on this

subject, and to argue to a jury the implausibility of such a contention.[4]  Again, the Court denies the

motion for spoliation without prejudice and Plaintiffs remain free to raise these issues at a later stage

of proceedings if appropriate.

Thus, Plaintiffs have failed to establish, with respect to the metadata or the email

correspondence, that such evidence ever existed and therefore could possibly constitute missing or

destroyed evidence that would entitle Plaintiffs to an adverse inference instruction.  Even though

the metadata, if it did exist and did demonstrate that the Excel Spreadsheet was modified after the

Rack and Stack meeting, might be relevant to Plaintiffs' claim, Plaintiffs have failed to establish

either that it did exist or that Otis negligently or intentionally destroyed it.  The Court is required to

engage in a "fact intensive" inquiry into the issue of culpability before concluding that a spoliation

instruction or other sanction is warranted.  Even if "Defendants may have been negligent in their

deletion of [the metadata], the record does not support a finding of bad faith or prejudice." *Goldman

v. Healthcare Managment Systems, Inc*., No. 05-cv-35, 2006 WL 3589065, at *2 (W.D. Mich. Dec.

8, 2006). Plaintiffs simply have not met their burden at this stage of the proceedings of producing

sufficient facts to permit the Court to conclude that Otis acted with a level of culpability justifying

the sanction of an adverse instruction as to any of the allegedly spoliated evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion to Strike Exhibit U and

 DENIES WITHOUT PREJUDICE Plaintiffs' Motion for Spoliation.

IT IS SO ORDERED.

---

[4]  As the Court noted previously in this Opinion and Order, the Court has yet to review, and
expresses no opinion on, the merits of Defendant's pending motion for summary judgment.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 13, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 13, 2012.

S/Denise Goodine
Case Manager

22