UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND ANDERSON, RALPH BROWN,
EARL LARDNER, JAMES LARDNER, ANTON
WOLF and RICHARD WRIGHT,                                    Case No. 11-10200

                Plaintiffs,

                                                Paul D. Borman
v.                                                         United States District Judge


OTIS ELEVATOR COMPANY,
a foreign Corporation,

                Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 54)

    This matter comes before the Court on Defendant Otis Elevator Company's ("Otis") Motion for Summary Judgment. (ECF No. 54.) Plaintiffs filed a response (ECF No. 67) and Otis filed a reply (ECF No. 89). The Court held a hearing on February 7, 2013. For the reasons that follow, the Court GRANTS Otis's motion.

**INTRODUCTION**

    This action involves claims of age discrimination by six individuals, two of whom also assert claims of race discrimination, who were employed as mechanics by Defendant Otis Elevator Company ("Otis") in the Detroit metropolitan area and were terminated in 2008-2009. Otis claims that the six Plaintiffs were among 17 mechanics who were laid off, and whose duties were assumed by other Otis mechanics, as part of a broader workforce reduction necessitated by economic conditions. Otis claims that Plaintiffs were selected for lay off pursuant to a performance ranking

system unrelated to the Plaintiffs' age and/or race. Plaintiffs claim that they were terminated and replaced by younger, less qualified mechanics and argue that the reduction in force, and the ranking system utilized by Otis to select them for lay off, were a guise for both age and race discrimination. Presently before the Court is Otis's Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiffs in this action are six former Elevator Journeymen Mechanics who worked for Otis and were laid off between February, 2008 and October, 2009. Plaintiffs worked at Otis's Detroit Branch Office which has three elevator departments - Modernization (updating existing elevator equipment), Construction (installation of new elevator equipment), and Service (repair and maintenance of existing elevator equipment). (ECF No. 54, Def.'s Mot. Summ. Judg. Ex. 2, March 9, 2012 Declaration of Joseph Steger ¶ 4.) In addition to performing work on elevators at various properties throughout the Detroit market, the Detroit Otis Office also contracts with Northwest/Delta Airlines to provide service and maintenance for elevators, escalators, moving walkways and an indoor tram system known as the Automated People Mover ("APM") at the Detroit Metropolitan Airport-McNamara Terminal ("DTW"). (*Id.* ¶ 9.)

Plaintiffs contend that they were terminated and replaced by younger workers and treated disparately compared to younger workers. Plaintiffs Anderson and Wright additionally allege that they were discriminated against because they are African American. Plaintiffs contend that there was a "corporate culture" at Otis that devalued older workers, that certain Otis employees made "ageist" and racist remarks and that African American mechanics were under-represented in the workforce.

Otis responds that it eliminated 40 hourly employees in Detroit through rolling layoffs which

began in January, 2009, including the lay off of 16 of its 72 mechanics in the relevant time period,

as part of a workforce reduction, including the six Plaintiffs in this action, each of whom, Otis

maintains, was among the lowest performing mechanics when terminated.  (Def.'s Mot. Summ.

Judg. Ex. 18, Interrogatory Resp. 5; Def.'s Mot. Summ. Judg. Ex. 17, March 6, 2012 Declaration

of Elizabeth Ceriello ¶ 7.)  Otis further responds that neither race nor age was a consideration in the

decision to layoff the six Plaintiffs.

In selecting the six Plaintiffs (along with 11 other mechanics who are not plaintiffs in this

lawsuit) for layoff, Otis purports to have relied, in part, on a ranking system, the Field Associate

Ranking, colloquially referred to as the "Rack and Stack," which was created by Otis on an annual

basis to compare employee performance based on a pre-selected set of criteria to evaluate the

workforce for possible layoffs.  (Def.'s Mot. Summ. Judg., Ex. 2, Steger Decl. ¶ 14, Ex. B, 2009

Rack and Stack; ECF No. 83, Pls.' Sealed Resp. to Mot. Summ. Judg. Ex. T, 2007 Rack and Stack.)[1]

According to the testimony of several Otis witnesses, the Rack and Stack was intended to reflect in

some measure the information reported by supervisors on employee performance evaluations, Field

Associate Performance Evaluations ("FAPEs").  (ECF Nos. 115-119, Pls.' Supplemental Brief

Regarding Summary of 2008 and 2009 FAPEs and Sealed Exhibits.)[2]

---

[1]  Plaintiff Wolf was terminated on February 1, 2008, earlier than the other five Plaintiffs and pursuant to a different Rack and Stack, the 2007 Rack and Stack.

[2]  Plaintiffs' recently-filed summary of the 2008 and 2009 FAPEs, which attaches copies of the hundreds of underlying FAPEs, adequately summarizes the underlying FAPEs without argument or enhancement.  (ECF No. 115.)  At an earlier stage of the proceedings, the Court struck Plaintiffs' Exhibit U, which Plaintiffs had proposed as a Federal Rule of Evidence 1006 Summary in support of their response to Otis's motion for summary judgment, because Exhibit U went far beyond summarizing, in an accurate and non-prejudicial way, the underlying voluminous documents. (ECF No. 103, Order Granting Defendant's Motion to Strike Exhibit U and Denying Without Prejudice Plaintiffs' Motion for Spoliation, copy attached.)

3

The FAPEs are prepared by supervisors to rate the performance of individual employees, scoring the employee on a given set of factors by assigning the employee a competency level (unsatisfactory, low/limited, medium and strong (or not applicable)) on the pre-selected set of factors.  For the most part, the performance factors considered by supervisors completing a FAPE, i.e. safety, ethics, focus on customer needs, customer relationship building, technical expertise, productivity, work quality, attitude, applying standard processes, dependability/reliability, communication, problem solving, results oriented, planning and organization, leveraging networks, troubleshooting skills, repair skills and availability for callbacks, are the same factors considered on the Rack and Stack.  The competency levels on the FAPEs are not assigned numeric values.

On the Rack and Stack, the competency levels utilized on the FAPEs are assigned numeric values: 1- unsatisfactory, 2 - low/limited, 3 - medium, and 4 - strong.  Additionally, on the Rack and Stack, the factors are weighted, i.e. given a rating from one to five, 1 - desired, 2 - encouraged, 3 - important, 4 - necessary and 5 - critical, corresponding to the criticality of each of the listed factors.  The competency number assigned for a given factor is multiplied by the weight assigned to that factor and the sum of those values is the total point number assigned to a given employee on the Rack and Stack.  Employees scoring the lowest total points were generally selected first for work force reduction layoffs, although other considerations, such as a customer request or a specialized skill, could trump the Rack and Stack order in certain circumstances.  When the Rack and Stack process originally began, the mechanics were ranked by department, i.e. Service, Construction and Modernization, separately.  Beginning in 2009, the Rack and Stack ranked all mechanics from all departments for the entire Detroit Office.  Although the Rack and Stack is a tool used in the event of a lay off, a Rack and Stack is performed every year, regardless of the need for lay offs in that

particular year.

Plaintiffs contend that the Rack and Stack was somehow "rigged" against them because the Rack and Stack values did not, in every case, exactly mirror the corresponding competency levels on each employee's FAPE. Plaintiffs claim that the FAPE scores and the Rack and Stack values were supposed to completely align and that disparities between the scores on the individual FAPEs and the scores on the 2009 Rack and Stack demonstrate that the 2009 Rack and Stick was "rigged" by Otis to target older mechanics for layoff in favor of younger, less qualified mechanics.

### A. The Otis Supervisors and Management Personnel Involved in the Plaintiffs' Terminations.

#### 1. Joe Steger

Joe Steger (Caucasian DOB October 3, 1966) has been employed as a Field Operations Manager responsible for the Service/Maintenance Department of Otis's Detroit Office since 2002. (Steger Decl. ¶¶ 2-3.) Steger reports to the General Manager of the Detroit Office, which was Tim Collins in 2007 and 2008 and Robert Olney in 2009. (Steger Decl. ¶ 2.) In his role as a Field Operations Manager (Maintenance), Steger oversaw Maintenance operations and provided technical support for the Detroit Office sales department. (Def.'s Mot. Ex. 1, October 3, 2011 Deposition of Joseph Steger, 25.) Steger also was responsible for helping to prepare the budget for Maintenance operations based on monthly performance projections. (*Id*. at 28-29.) Steger would receive monthly reports from Otis's corporate headquarters that would set forth the profit that Maintenance was expected to achieve. (*Id*. at 29-30.) The Maintenance Department did not meet budget in 2009. (*Id*. at 35.)

In the latter half of 2008, Steger became aware that Otis experienced a significant decline in business due to the overall declining economy and particularly in Otis's Construction and

Modernization departments.  As a result of the decline in business, and in an effort to cut costs, the Detroit Office implemented a workforce reduction and laid off mechanics and apprentices on a rolling basis.  (Steger Decl. ¶ 11.)

In his role as the Field Operations Manager of the Detroit Office, Joe Steger oversaw the Rack and Stack ranking process and was the official, and sole, custodian of the final Rack and Stack document.  (Def.'s Mot. Summ. Judg. Ex. 1, Steger Dep. 100-01.)  In this role, Steger oversaw the January 21, 2009 Rack and Stack meeting that resulted in the preparation of the 2009 Rack and Stack, pursuant to which Otis claims to have terminated each of the Plaintiffs, with the exception of Wolf, who was terminated earlier pursuant to a different Rack and Stack, the 2007 Rack and Stack.  (Steger Dep. 93-95.)  The 2009 Rack and Stack, for the first time, consolidated and ranked mechanics from all three of Otis's departments, i.e. Construction, Modernization and Maintenance/Service, into one single Rack and Stack.  Previously, the mechanics had been ranked only against other mechanics from their department.  (Def.'s Mot. Ex. 1, Steger Dep. 57-58; Def.'s Mot. Ex. 2, Steger Decl. ¶¶ 12-14.)  The consolidation across departments in 2009 was done on the recommendation of Otis's Labor Relations Manager, Betsy Ceriello.  (Steger Decl. ¶ 14.)

Steger was involved in the decisionmaking process that led to the lay offs of Brown, Anderson, E. Lardner, J. Lardner and Richard Wright to the extent that Steger oversaw the January 10, 2009 Rack and Stack meeting at which each of the Detroit Office supervisors participated in the group ranking of mechanics based upon their evaluations  of the mechanics whom they supervised. (*Id.* ¶ 16.)  The written product of this meeting, the 2009 Rack and Stack, was then used in as a tool in making lay off decisions later in the year.  According to Steger, the 2009 Rack and Stack was not dispositive in his decision to recommend a certain mechanic for lay off, but was considered by him

6

in addition to other information that he may have learned, or other manpower changes that might have been made, between the January meeting and the time that lay off decisions were made. (*Id.* ¶¶ 16-17.) Each time Steger recommended a particular mechanic for lay off, this decision was reviewed by Betsy Ceriello, Otis's Labor Relations Manager, to ensure compliance with all equal employment laws, union contracts and licensing laws. (*Id.* ¶ 17.)

### 2.    Phil Davis

Phil Davis (DOB 5/6/75) was the Field Operations Manager at Otis's Detroit Office from January, 2007 to May, 2011. (Def.'s Mot. Ex. 14, March 9, 2012 Declaration of Philip Davis ¶ 3.) Phil Davis testified that when the DTW contract was renegotiated in January, 2007, there were "significant" financial concessions that had to be given back to the airport, which was reflected in the monthly revenues that Otis received from Delta (Northwest at the time) for work performed at the DTW. (Def.'s Mot. Summ. Judg. Ex. 9, November 23, 2011 Deposition of Philip Davis 27-28; Def.'s Mot. Ex. 14, Davis Decl. ¶ 7.) Many cost cutting measures were put into place in early 2007 to compensate for the loss in revenue (approximately 10% of Otis's total revenues) resulting from the DTW contract renegotiation, including the termination of one airport mechanic. (Def.'s Mot. Ex. 9, Davis Dep. 27-28, 31.) In the summer of 2007, it became clear that in order to achieve the necessary savings, Otis would need to reduce its workforce. (*Id.* at 45-46.) This decision was made by Davis, Steger and Tim Collins, then the General Manager of the Detroit Office. (Davis Decl. ¶¶ 8-9.)

Davis made the decision to lay off Plaintiff Tony Wolf who was the lowest ranked mechanic on the 2007 Rack and Stack comparing airport employees. (Davis Dep. 52, 125, 132; Davis Decl. ¶ 10.) Davis testified that the Rack and Stack process was completed first and then the Rack and

7

Stack values would be used to complete the FAPEs.  (Davis Dep. 68-69.)  It was Davis's understanding that the Rack and Stack results were supposed to align with the FAPE for the following year.  (*Id*. at 89-90.)  Davis explained that because the Rack and Stack process utilizes numerical values and the FAPEs do not, there was some inherent variation between the two processes due to rounding up or down.  (*Id*. at 92-93; 118.)  Davis recalled that at the Rack and Stack meetings, there was always some disagreement among the group about almost every mechanic being discussed.  (*Id*. at 96-98.)   According to Davis, the FAPEs and the Rack and Stack scores were supposed to match but changes were sometimes made after discussions at the Rack and Stack meetings.  While it was unusual for someone to be marked from say a four to a one, i.e. from strong to unsatisfactory, it was not uncommon for a score to go from say a three to a two, i.e. from a medium to a low.  (*Id*. at 205-09.)  Because the entire labor force, beginning in 2009, was evaluated together, and the lowest ranked mechanics were the first to be considered for lay off, higher performing mechanics from one department could be transferred to another department when a lay off was necessary.  (*Id*. at 150-51.)

Mr. Davis also made the decision to terminate Plaintiff Ralph Brown.  (David Dep. at 159-60; Davis Decl. ¶ 14.)  Brown was selected because he was the lowest ranking mechanic working on the APM at the time the General Manager (Robert Olney at the time) informed Mr. Davis that he needed to eliminate a mechanic.  (Davis Decl. ¶ 14.)  Phil Davis also selected Richard Wright for lay off because at the time the decision was made to eliminate another airport mechanic, Mr. Wright was the lowest performing mechanic on the 2009 Rack and Stack.  (Davis Decl. ¶ 16.)  Mr. Davis did not recall any new hires since Mr. Wolf's lay off in 2008; all of his employees were transfers from other departments.  (*Id*. at 217.)

8

### 3.      Keith Hearns

Keith Hearns, the supervisor who participated to some degree in the decisions to terminate Plaintiffs Earl Lardner, James Lardner and Ray Anderson, testified that "the Rack and Stack process is an internal management tool" that Otis used to rank its employees against each other, and that the Rack and Stack was used to select employees for lay offs when lay offs were mandated.  (Def.'s Mot. Ex. 11, October 4, 2011 Deposition of Keith Hearns 69-70, 73, 75, 97-99.)  Hearns testified that he takes his FAPEs for the year into the Rack and Stack meeting and uses the FAPEs "as a guide" that only "loosely" informs the ultimate numeric figures on the Rack and Stack.  (*Id.* at 79-80.)  Hearns testified that there was no directive to make the FAPE "equal" to the Rack and Stack and there was no requirement that one be "an absolute map[]" to the other.  (*Id.* at 80-82.) Specifically, Hearns explained:

> Q:      [W]hen you first talk about the numbers for the mechanics for each performance factor, you're talking about a number from one through four, correct?
>
> A.      In the rack and stack?
>
> Q:      Yeah.
>
> A:      No, it never - As a supervisor when I go to the rack and stack meeting, I go in with a strategy, all right. I go in with where I want my guys to fall 'cause I have an idea of their strength and weaknesses, all right.  So I go in not with twos.  I may go I with 2.5's or 2.6's for certain things. . . . Because I know what the rack and stack is.  It's a rank ordering of our population and that's what happens in that meeting.  We rank order the population.
>
>             *          *          *
>
> Q:      This [FAPE] has no numbers and so this category in terms of numbers doesn't have to be an absolute mapping one to one. That's my testimony.
>
> Q:      And so you said you used [the FAPE] as a guide.  How do you change the numbers when you go into the rack and stack?

> A:    Since I said there are no numbers on the [FAPE], I have to apply a number.
>       There's no change in the number.

(*Id*. at 73, 82) (colloquy omitted).

Differences between the FAPE and the Rack and Stack, Mr. Hearns explained, additionally would occur because the Rack and Stack meeting involved the input of "every field manager that has people on the list," and although he brought his completed FAPEs with him to the Rack and Stack meeting, the numbers ultimately entered on the Rack and Stack were collectively agreed upon and changes to FAPE values would be made if there "was enough agreement." (*Id*. at 85-87, 91-92, 95-96, 112-13.)  Specifically, Hearns testified:

> Q:    Okay. As I understand it, the process was that it [the rack and stack meeting]
>       would go by each person.  Each mechanic would be sort of flashed up on the
>       screen and the numbers would be put in; is that right?
>
> A:    Well, they - Yes.
>
> Q:    Okay. And then there would be a discussion about that individual or no?
>
> A:    Yes.
>
>                         *                  *                  *
>
> Q:    Okay. And when - After all of the mechanics had been flashed on the screen
>       and their numbers put in, did they resort the spreadsheet at that point in time
>       so you could see who was marked the lowest and who was marked the
>       highest?
>
> A:    Yes.
>
> Q:    So you had a visual while you were there?
>
> A:    Yes.
>
> Q:    And then did people say well, so and so should be ranked higher than so and
>       so and then there being haggling over the numbers or were the numbers not
>       changed after that sort?

A:     Well, that's - That characterization is not the words.  You would say hey, I think this individual does better work than this one or has a better attitude than that one.

Q:     Okay.

A:     And so those discussions would take place, yes.

Q:     Okay. And so would the numbers be changed then after the sort by rank was reviewed?

A:     If there was enough agreement, yes.

(*Id.* at 91-92.)

Hearns also explained that the Rack and Stack, unlike the FAPEs, is a weighted system and includes numbers that can be fractional, making their totals inherently different in some instances from the FAPEs.  (*Id.* at 72-74.)  Hearns testified that he did not believe that the numbers on the Rack and Stack were ever changed after everyone left the Rack and Stack meeting: "[A]s a management team we trust one another that they wouldn't go behind our backs and change numbers we didn't agree to."  (*Id.* at 93-94.)

### 4.    Paul Jellison

Paul Jellison, the supervisor who communicated the termination decision to Plaintiff James Lardner, testified to his understanding from his training by Otis that the FAPE assessments and the numbers on the Rack and Stack were supposed to correlate and that, prior to 2010, the supervisors would generally try to transfer the information from the FAPE onto the Rack and Stack spreadsheet but they didn't always match up exactly.  (Def.'s Mot. Ex. 12, October 4, 2011 Deposition of Paul Jellison 48-49.)  Beginning in 2010, the final FAPEs for the year were completed and issued after the Rack and Stack meeting, to be certain that the two would match.  (*Id.* at 56-57.)  Specifically, Jellison testified as follows:

A:    When I first got to the office in '06 and '07, we didn't lay people off often. So we would do an evaluation and it would not necessarily match up exactly with the rack and stack, but since then they - today they match very closely. I mean there's always -

Q:    How do you know that?

A:    Because we go in and before we will issue the final evaluations now, we will do the rack and stack, so we make sure that the numbers are the same.

Q:    Is that in 2010 or 2011?

A:    That's in 2010.

Q:    Okay. So 2008, 2009 were you checking to see if they were close?

A:    In 2009, yes.  In 2008 I'm not sure if we had started that procedure yet.

                    *                    *                    *

Q:    Okay. So maybe the process has been improved since 2009?

A:    It's definitely been improved over the past few years.  Specific dates, I don't want to speak to those 'cause I'm not sure, exactly when it started.

Q:    And by improved you're defining that as being more like the evaluations?

A:    Correct.

(Jellison Dep. 57-59.)  Describing the Rack and Stack system prior to the 2010 changes, Jellison explained, as Hearns testified, that the numbers a supervisor would suggest from their FAPE could be changed based upon discussions at the Rack and Stack meeting, based upon the collective input of "a room full of supervisors with varying levels of experience." (*Id*. at 64.) Jellison explained that he would "put up his numbers," and "people might say blah, blah, blah, you know, not a three but a two, that kind of thing."  (*Id*. at 65.)  There would be discussion and sometimes a change would be made that would result in a different evaluation on the Rack and Stack.  All of the Plaintiffs in the instant case were laid off under this system of evaluation as it existed prior to 2010:

12

Q:    Okay. So it's not true that the performance evaluation ratings correspond.

A:    But then we would have to change our evaluation now.

Q:    Now you'd have to. I don't care about now. What I care about is 2009 when all my people were terminated.

(*Id*. at 66.)  Although each of the Plaintiffs was terminated because of their ranking in the bottom 25% of mechanics on the 2009 Rack and Stack, they were not terminated for poor performance but due to lack of work and their rankings on the Rack and Stack.  (*Id*. at 69.)

### 5.    Gregory Testolin

Gregory Testolin (Caucasian DOB 1/20/51), who supervised Plaintiff Earl Lardner, testified that he brought his FAPEs with him to the Rack and Stack meetings and that it was important that the numbers from the FAPEs go directly into the Rack and Stack and that the "goal" was that they be parallel. (Def.'s Mot. Summ. Judg. Ex. 13, October 5, 2011 Deposition of Gregory Testolin 52, 69-71, 75, 76.)  Testolin confirmed that the numbers he would put up from his FAPEs could be changed by the group at the Rack and Stack meeting but that rarely happened.  (*Id*. at 73-74.)

### 6.    Robert Olney

Robert Olney (Caucasian DOB 10/10/73) was the general manager for the Greater Detroit Metro Otis offices and started with Otis in January, 2002.  (Def.'s Mot. Summ. Judg. Ex. 15, November 28, 2011 Deposition of Robert Olney 12-13.)  As the general manager, Olney was responsible for profit and loss, growing sales and controlling costs.  (*Id*. at 16.)  Olney testified to his understanding of the Rack and Stack process as follows:

Q:    Now describe to me, if you can, what you understand to be the rack-and-stack process. . . .

A:    I understood it to be a process in which field supervisors were gathered together to rank each employee and agree on - somewhat agree on where they

13

fell in the total ranking of our office.

Q:     And how was that supposed to happen?

A:     By ranking a different number of factors. I don't remember if there were five
       or 10 factors.  But ranking a different number of factors to come up with a
       cumulative score.

                    *                    *                    *

       They would put up a projector and a spreadsheet, and each employee would
       go through their individuals, and then you could re-sort the spreadsheet based
       on that cumulative value, and it would rank and file the employees.

Q:     And those scores - was there a lot of debate during the meetings that you
       were at about whether or not the immediate supervisors' scores were
       reasonable?

A:     There was definitely discussion from multiple people in the room.

Q:     Do you remember there being a lot of changes to the scores that the
       immediate supervisors would place in the spreadsheet?

A:     No, not necessarily.

Q:     So was a change rare?

A:     Yes, I guess so.  There were times where it was discussed and times it was
       changed and times it wasn't changed.  And I wasn't there for every one, so
       I don't know.

                    *                    *                    *

Q:     Okay.  Were you aware that the results from the rack and stack had to align
       with the annual performance evaluations and other items that would be in the
       personnel file?

A:     I think it was generally accepted that the rack and stack should somewhat
       reflect the performance evaluation.

Q:     Okay.  Somewhat or align?

A:     I think its tough to say align just because there's differences.  But I would say
       somewhat.

14

(Def.'s Mot. Ex. 15, Olney Dep. 43-47, 51-52.)

Olney testified that either he or the general manager would have made Joe Steger aware of a need to reduce the workforce and explained that there would have been no computer or email trail regarding the need for a reduction in work force:

> Q:    If you were the one who was telling him [Joe Steger], would you send him an e-mail? Would you - how would you -
>
> A:    I mean, it's - we talked a lot, so it would probably just be a conversation when I was there.
>
> Q:    Okay. Don't you think that there would be some piece of paper somewhere saying that, you know, "we need to make a reduction?"
>
> A:    No.
>
> Q:    Not in any of the layoffs that were made through the years 2008, 2009.
>
> A:    There could be or there could not be.
>
> Q:    Okay, does the labor relations tell you to document things?
>
> A:    No.
>
> Q:    Okay. So labor relations has never told you that it was important to keep a record of why these - why these layoffs were occurring?
>
> A:    I can't tell you that I've ever had that conversation with them, no.

(Def.'s Mot. Ex. 15, Olney Dep. 70-71.)

Olney also testified that it did not surprise him that the layoffs did not proceed exactly according to the rankings on the Rack and Stack: "It wouldn't surprise me that it wasn't done in order just because there's different factors. This [the rack and stack] is kind of a guide." (*Id*. at 73.) Olney testified that a loss of business in one of the departments, i.e. Construction, Modernization or Maintenance, did not necessarily mean that the reductions would come from that affected

15

department.  That is why, Olney explained, the Rack and Stack was done across departments, so that the lowest performers would be considered for lay off regardless of the department that employed them.  (*Id*. at 75.)

Olney testified that in 2008 he was managing a $50,000,000 office and by the time he left, at the end of 2010, the office was a $40,000,000 office due to loss of revenue on the Construction side and due to the unwillingness of customers to pay for their elevator service needs.  (*Id*. at 75-77.) Olney testified that business had declined approximately 20% between 2008 and 2010 when he left Otis.  (Olney Dep. 39.)

Olney explained that Otis tried to promote diversity and that "every time [they] had to lay people off, [race] was one of the - one of the discussions points was, if they were a protected class, we wanted to talk with Betsy [Ceriello] and make sure that we had exhausted our options."  (*Id*. at 87.)  Although he couldn't recall specific discussions regarding Plaintiffs Wright or Anderson, he explained that there was a possibility that when told by Joe Steger who had been selected for lay off, he (Olney) may question whether the protected class discussion had taken place and make sure that the lay off was cleared through Betsy Ceriello.  (*Id*. at 88.)  Olney also explained that the financial documents that would support the reductions in work force would be the monthly "selected operating data" reports.  (*Id*. at 108-09.)  Olney was not aware of the existence of any "labor budget" documents.  (*Id*. at 78.)  Olney also testified that he would not necessarily be surprised to see a big point differential between a FAPE and the Rack and Stack number as long as there was "some sort of consistency" between the two.  (*Id*. at 91-93.)

### 7.    Betsy Ceriello

Betsy Ceriello is a labor relations lawyer who has been employed by Otis as a labor relations

manager since 2001.  (Def.'s Mot. Summ. Judg. Ex. 16, December 2, 2011 Deposition of Elizabeth A. Ceriello 33, 69.)  Her job duties include reviewing proposed lay offs and terminations of Otis employees for compliance with labor laws and company policies.  She performed this function with respect to each Plaintiff in the instant case.  (*Id*. at 75-76; 131-32; 133-34; Def.'s Mot. Ex. 16, Ceriello Decl. ¶ 6.)  In 2009, Otis laid off 40 employees, including 16 mechanics.  (Ceriello Dep. 136; 277-79;  Ceriello Decl. ¶ 7.)  Ms. Ceriello explained that her two main objectives in reviewing lay off requests were (1) to retain the best performing workforce and (2) to ensure compliance with the collective bargaining contract and any licensing or equal protection laws.  (*Id*. at 142.)  Ms. Ceriello described her role as a "check and balance" on the Rack and Stack/lay off process.  (*Id*. at 146.)  According to Ms. Ceriello, as of August 31, 2008, approximately 65% of the mechanics and apprentices in Detroit were over 40 years old.  Following the lay offs in 2009, as of January 1, 2010, approximately 74% of the mechanics and apprentices in Detroit are over 40 years old.  (Ceriello Decl. ¶ 8.)  Following the 2009 lay offs, the following mechanics, all of whom were older than Plaintiffs, were retained by Otis: Orlando Asmat, Kevin Frush, Larry Kubert, JP Lagaeux, Warren Morche, and Jim Whims.  (Ceriello Decl. ¶ 8.)

Ms. Ceriello emphasized that in a lay off situation, which is how these Plaintiffs were terminated, all of the laid off mechanics were qualified - they were not terminated for poor performance.  Their ranking at the lower end of the Rack and Stack was a reflection of where they fell among a group of qualified mechanics, not a finding by Otis that they were poor performers. (*Id*. at 147; 234.)

Until she rolled out the "Paint One Picture" training program in mid-2009, which emphasized that the FAPEs and Rack and Stack should directly align, Ms. Ceriello would hold

informal, verbal training sessions with supervisors regarding the FAPE and Rack and Stack process.
(*Id*. at 163-64; 181.)  One of the objectives of the Paint One Picture training program was to improve
the chance of prevailing on claims by hourly employees upon layoffs and terminations.  (*Id*. at 182.)
Ms. Ceriello conceded that in creating the 2009 Rack and Stack, the first cross-departmental Rack
and Stack, there were more discrepancies between the FAPEs and the Rack and Stack than she
would like to see but that it was the first time the supervisors had done it across departments and that
the alignment between the two improved in subsequent years.  (*Id*. at 188-89, 203.)  In a perfect
world, the "final portrait" if you will, would perfectly align the FAPE, the Rack and Stack, their job
completion rates and the contents of their personnel files.  (*Id*. at 236.)

Ms. Ceriello explained that the reason behind Plaintiff Wolf's lay off was the tough
renegotiation of the Otis contract with the DTW airport and the substantial cost concessions that Otis
had to make to retain that contract.  (*Id*. at 73-75.)  She was told by Phil Davis that in order to meet
the DTW cost concessions and retain the DTW contract, they had to "lose a person and restructure
the workforce."  (*Id*. at 78.)  Ms. Ceriello asked for the 2007 Rack and Stack and determined that
Tony Wolf was the lowest performer.  (*Id*. at 79.)  Ms. Ceriello testified that she would analyze the
Rack and Stack herself, to get "a snapshot" of the employees on the Rack and Stack closest to the
individual facing lay off to determine things like race and age.  (*Id*. at 98-99; 108-09.)  Ms. Ceriello
does not conduct any independent analysis of the business justifications presented to her by the
manager or supervisor requesting authorization to lay someone off.  (*Id*. at 101.)  Ms. Ceriello did
not ask the field supervisors or managers to document their reasons for a lay off but typically
received their reasons in a telephone call.  (*Id*. at 105.)

On the issue of aligning or matching the figures on the Rack and Stack to the FAPEs, Ms.

18

Ceriello testified as follows:

Q:      Did you promulgate a rule recently that the FAPE has to match exactly the rack and stack when they put it in?

A:      It's - in the ideal world that's how it would be.

Q:      Okay.

A:      In an ideal world.

Q:      Is there a rule now that that has to happen as opposed to in 2009 or 2010 -

A:      They have to align -

Q:      - before that was a rule?

A:      Sorry. They have to align.

Q:      . . . Were the management employees ever told that they had to put their FAPE numbers into the rack and stack?

A:      They can do it one of two ways.  They can either create the rack and stack with the numbers looking at the whole workforce at one time and do it that way and then go back and fill out the performance evaluations and make any other comments they'd like to do or they can take the performance evaluations they did and then correlate them onto the rack and stack.

                        *                    *                    *

A:      This evolved over time.  Back at the time frame that these layoffs happened . . . they were just starting at my request to, as I called it, paint one picture. You could have – When you looked at an employee, the information you had on them would be consistent 'cause it should be in the different places that you look.

Q:      Why should it be?

A:      Because if you're looking to evaluate - There's two things. When you individually rate an employee, you do that. One supervisor sits down and based upon the 10/15/20 employees that they have, they're kind of rating their employees within that group, but when you try to then put that all onto an office wide assessment of skills so you can move people around as you see best, there's gonna be people that grade differently.  There's gonna be

> people that want to play their favorites.  There's gonna be all kind of things
> that come into play and you just want to make sure you have the best - it's
> the best reflection that you can have of people's performance individually
> and then as a group.  So, you know, that's - that's what I would ask them to
> do.

(Def.'s Mot. Summ. Judg. Ex. 16, Ceriello Dep. 112-114.)  "In end they have to produce this

document called the FAP[E]. It matters not to me if they do this [Rack and Stack] first and put it on

there [FAPE] or do that [FAPE] first and put it on here [Rack and Stack].  So in Detroit I believe the

first when they did this combined one, I believe they tried doing it the second way when they did

that – produced that particular January '09 Rack and Stack."  (*Id*. at 174.)

With regard to the 2009 Rack and Stack, and Plaintiffs' terminations, Ms. Ceriello explained

that she did check several FAPEs of the lowest ranked employees against the Rack and Stack and

was not concerned with the disparities between the two because this was the first time that the

supervisors had been required to sit down and create a Rack and Stack that covered all departments.

(*Id*. at 123-124.)  She excused disparities because of the likelihood that different supervisors from

the different departments had different grading systems: "It was the first time we were kinda putting

them on to one big rack and stack.  So I would expect to see some deviation."  (*Id*. at 124.)

Specifically, she testified as follows:

> A:  When you put them [mechanics] up onto the rack and stack, I call it a horse
> trading session.  They all sit down and go okay, you know, Joe, put yours up
> and Paul put yours up and they put them up there.  I'm not usually in on these
> sessions.  So they put them up there and they have to say oh, wait a second.
> This don't look right.  This guy is a much harder performer than that guy.
> That guy, no he can't do that as well and then they have to kind of come up
> with - I call it kind of calibration of different ways supervisors look at how
> they grade people or use the criteria that are - What's a medium to some
> person might not be a medium to somebody else and you then begin to see
> that when you put different people's ratings up there.  So they might actually
> - This is where you might see some differentiation from what's on the
> performance appraisal being fact and the rack and stack, because they might

> actually when they do the rack and stack, actually make adjustments on the rack and stack after that are different from this, after the performance appraisal. That could happen especially since they had just done it for the first time there. They had not really as a group looked at it that way whether they did it under either one of those two systems. So that's where you might see a disparity.

(*Id*. at 172-73.)   Over time, Ceriello explained, they were looking to have it be more aligned, but she was not surprised that this first group at this point in time may have done it imperfectly. After looking at the FAPEs and the Rack and Stack in the case of each of the Plaintiffs, Ceriello was satisfied that those being laid off were among the lowest performers. (*Id*. at 126-27.)   Ms. Ceriello also testified that if a lay off was done some months after the Rack and Stack, there could be changes to the Rack and Stack if, for example, people's performance had changed in the intervening months. (*Id*. at 286.) She indicated that the only person who would be able to explain why the FAPE and the Rack and Stack scores varied would have been the supervisors themselves who participated in the Rack and Stack meeting. (*Id*. at 198, 203.)

In approving the lay offs of the Plaintiffs, Ms. Ceriello did not conduct an analysis of whether the disparities between the FAPEs and the Rack and Stack disproportionately affected any protected group:

> Q:    Yeah. So here's another situation where whether you're looking at 2008 or 2009 his scores [on the Rack and Stack] are like 50 points different than it would have been if you used the [FAPE] numbers.  Is that within your definition of what align means?

> A:    No, that they should be - Again, this is a tool.  This is a tool meant to reflect this.  It was the first time they did it, again, the way they did it, and then they sit around and they have a conversation based upon performance vis-a-vis to each other.  So this is ranking them against each other.  This is ranked - That's in the rack and stack.

> Q:    What are you saying by this?

21

A:      The rack and stack is being ranked then against each other.

Q:      Uh-huh.

A:      This [FAPE] is being them ranked against the criteria.  So you could have deviation when they're sitting in a room vis-a-vis they make some adjustments.  Everybody's scores might have come down or changed that way.  I mean you have to look at other people. To make the kind of assumptions you're making, you have to go back and look at other folks on here and look at higher ranking folks and I don't know if the correlation is there - is still there.

Q:      Well I did.  Actually, the higher ranking people don't have any disparity.

(*Id*. at 208-09.)  Ms. Ceriello was not aware and could not explain why the Plaintiffs' FAPE and Rack and Stack scores appeared at such variance from one and another: "I have no knowledge of how that would have happened.  So you'd have to ask who that might have been done by."  (*Id*. at 211.)  She testified that she never changed the Rack and Stack numbers and that Joe Steger would have been the last person with access to those numbers after the Rack and Stack meeting.  (*Id*. at 212.)

**B.      The Plaintiffs' Terminations**

**1.      Ray Anderson**

Plaintiff Ray Anderson is African American and was born on April 7, 1956.  (ECF No. 1, Compl. ¶¶ 12, 13.)  Anderson was originally employed by Otis in 1975 and, after several years working elsewhere, was rehired by Otis again in 2003 when Otis acquired the company that employed Anderson.  (Def.'s Mot. Ex. 3, June 28, 2011 Deposition of Raymond Anderson 144; Compl. ¶¶ 15, 16.)  Anderson worked for Otis as an elevator journeyman mechanic assigned to Harper Hospital for several years but was reassigned to a different position upon his return from a

22

medical leave in 2008. (Anderson Dep. 45-47, 50, 60; ECF No. 18, Otis's Supplemental Interrogatory Resp. 5.) According to Otis, Anderson was terminated in 2009 because there was a downturn in business and several individuals were selected for layoff. (Def.'s Mot. Summ. Judge. Ex. 11, Hearns Dep. 102-03.)

Anderson's supervisor, Keith Hearns (African American DOB 8/6/56), communicated the lay off decision to Mr. Anderson at the direction of Joe Steger. (*Id*. at 144-45, 149, 152.) Hearns, also an African American, testified that Anderson had expressed to Hearns his opinion that the elevator industry in the 1970's was racist but that he, Hearns, had never heard any racially derogatory comments while working for Otis. (*Id*. at 154-55.) Betsy Ceriello, Otis's Labor Relations Manager for the Midwest Region, explained that at her request, Mr. Anderson, an African American, was once or twice passed over for lay off in part to promote Otis's policy of encouraging diversity in the work force. (Def.'s Mot. Ex. 16, Ceriello Dep. 142-43; Def.'s Mot. Ex. 17, Ceriello Decl. ¶ 3.)

While Anderson was on medical leave, Roy England (Caucasian DOB 11/28/62) performed his job duties at Harper Hospital. (Def.'s Mot. Ex. 1, Steger Dep. 162; Def.'s Mot. Ex. 18, Otis's Supp. Interrog. Resp. 5.) Anderson was terminated on June 16, 2009 and Matt Cole (Caucasian DOB 4/14/61), who was returning from leave, replaced Anderson. (Def.'s Mot. Summ. Judg. Ex. 3, Anderson Dep. 43; Compl. ¶ 21.)[3] Cole's move to Anderson's position was made because Ron

---

[3] Plaintiff states that Cole had been placed on a three month suspension for driving a company vehicle while intoxicated. Cole apparently slipped on ice and broke his foot which necessitated his leave but was later determined to have been under the influence of alcohol, and on company business, at the time of the incident. (Def.'s Mot. Ex. 1, Steger Dep. 172-76; ECF No. 69, Sealed Exhibit D to Pls.' Resp. to Mot. Summ. Judg., Excerpts from EEOC Filing at 2.)

Nanney (Caucasian age 38),[4] the third highest ranking mechanic in Detroit, whose position servicing the Oakwood Hospital account was eliminated when Otis lost that account, assumed Cole's position when Cole went on leave. Nanney, a high performer, was retained in Cole's position after Cole's return. When Cole returned from leave, Anderson was terminated and Cole was placed in Anderson's position at Harper Hospital. (ECF No. 69, Pls.' Resp. Sealed Ex. D, EEOC Proceedings Excerpt at 2; Def.'s Mot. Ex. 2, Steger Decl. ¶¶ 20, 21; Def.'s Mot. Ex. 3, Anderson Dep. 49-52.) Mr. Cole ranked 22 places higher on the 2009 Rack and Stack than Anderson and was only five years younger than Anderson. (ECF No. 69, Pls.' Resp. Sealed Ex. D, EEOC Proceedings Excerpt at 3.)     **2.     Ralph Brown**

Plaintiff Ralph Brown is Caucasian and was born on April 13, 1958. (Def.'s Mot. Ex. 4, September 7, 2011 Deposition of Ralph Brown 35-36.) Brown worked almost exclusively at the DTW on the tram but also did some traditional service work at the DTW. (*Id*. at 31.) Brown was terminated on August 11, 2009. (*Id*. at 12.) Following his termination, Brown's job duties were performed by Kerry Kimlin (Caucasian age 47), who had advanced from the position of apprentice to mechanic in the summer of 2009, and who was performing the same work as Brown prior to Brown's termination. (Def.'s Mot. Ex. 9, Davis Dep. 191-92; Def.'s Mot. Ex. 4, Brown Dep. 12, 73-75; Def.'s Mot. Ex. 14, Davis Decl. ¶ 13.)[5]   Davis "selected Brown for layoff based on [his]

---

[4] Where the parties have referred to an individual's age in lieu of a birth date, the Court notes that those ages are calculated for Plaintiffs as of the time of their layoff and for non-Plaintiffs as of the date of the January 21, 2009 Rack and Stack.

[5] Brown disputes that Kimlin was transferred to his position after he was terminated and states that a new employee, Roy England, was hired to replace him. (Brown Dep. 71-76.) Brown admitted, however, that he was not privy to Otis's management decisions about who gets what job and that it was just his belief that Kimlin did not replace him because he and Kimlin had previously performed the same job duties. (*Id*. at 75-76.) Given the fact that England and Kimlin were roughly

review of the 2009 rack and stack.  Given the other 2009 layoffs that had already occurred, Brown was the lowest ranked remaining mechanic working on the APM."  (Def.'s Mot. Ex 14, Davis Decl. ¶ 14.)  Brown testified that he was aware that other Otis mechanics also were being laid off at the time of this termination.  (Def.'s Mot. Ex. 4, Brown Dep. 15.)  Kerry Kimlin ranked 16 places higher than Brown on the 2009 Rack and Stack and was 49 at the time of Brown's termination, three years younger than Brown.  (ECF No. 70, Pls.' Resp. Sealed Ex. E, Excerpts from EEOC Proceedings.)

Brown testified that sometime in 2000 (Brown was 42 at the time) two of his supervisors, both of whom were the same age or older than he, gave him a bow tie to wear and said this is what the old timers wore, put it on.  (Brown Dep. 33-36.)  Brown also testified that his supervisor, John Mosella, would make comments about Brown being older and not able to move so fast and precluding Brown from "riding the bike" to service the tram, which required a quick service turnaround time.  He also testified that his co-worker on his shift, Harry Marshall, who was older than Brown by about ten years, was permitted to "ride the bike" while Brown handled the control panel.  *Id*. at 37-41.  Brown also testified that he viewed a training video that warned about the propensity for older workers to experience a greater number of accidents on the job.  *Id*. at 40-43. Brown testified that he believed the FAPEs were the arbitrary opinion of a supervisor but was unable to point to any portion of the FAPE that actually was designed to be adverse just to older workers. *Id*. at 56-57.  Brown was terminated by Phil Davis and was told that he was being laid off due to lack of work.  *Id*. at 65-66.

### 3.    Earl Lardner

Plaintiff Earl Lardner is Caucasian and was born on May 2, 1952.  Earl Lardner was

---

the same age, this is not a material disputed fact.

25

terminated on August 20, 2009 and his duties were assumed by Ed Idyle (Caucasian DOB 5/8/66). (Def.'s Mot. Ex. 5, August 1, 2011 Deposition of Earl Lardner 12, 29-30; Def.'s Mot. Ex. 13, Testolin Dep. 38.)  Mr. Idyle was working for Otis at the time Earl Lardner was laid off and had been working there prior to Lardner's termination.  Idyle was a long term Otis employee and was not hired as a new employee to replace Earl Lardner.  (E. Lardner Dep. 43; Testolin Dep. 117.)  Mr. Idyle ranked 45 places higher than Earl Lardner on the 2009 Rack and Stack.  (ECF No. 71, Pls.' Resp. Sealed Ex. F, Excerpts from EEOC Proceedings.)

Earl Lardner was dissatisfied with his March, 2009 FAPE from his supervisor, Greg Testilon. (Def.'s Mot. Ex. 5, E. Lardner Dep. 23.)  He felt that there was no standard for the evaluation for a particular skill and that the basis for the numbers assigned to them was never explained.  (*Id.* at 28-29.)  Earl Lardner testified that his supervisor, Greg Testilon, who was close in age to Mr. Lardner, asked him what his plans were for retirement but that Lardner thought nothing of the questions at the time.  (*Id.* at 30-31.)  Testilon never suggested to Lardner that he was too old or physically incapable of performing his job duties.  (*Id.* at 32.)  Testolin was involved in terminating Earl Lardner's employment in the sense that he was responsible for the evaluation that determined Earl Lardner's ranking on the 2009 Rack and Stack.  (Def.'s Mot. Summ. Judg. Ex. 13, Testolin Dep. 78-81.)  Like the other Plaintiffs, Lardner recalls seeing a training video that discussed the fact that older workers are more prone to work place injuries.  (*Id.* at 33-34, 37.)

### 4.   James Lardner

Plaintiff James Lardner is Caucasian and was born on March 2, 1956.  James Lardner was terminated on October 9, 2009 and his job duties were assumed by Bryan Morche (DOB 8/26/71), who was at that time an Otis employee working in service.  (Def.'s Mot. Summ. Judg. Ex. 6, August

5, 2011 Deposition of James Lardner, 9, 57; ECF No. 73, Pls.' Resp. Sealed Ex. H, Excerpts from EEOC Proceedings 2.) Lardner was terminated by Paul Jellison (Caucasian DOB 8/2/77) who both participated in the decision to lay off James Lardner and delivered to him the news that he had been laid off. (Def.'s Mot. Ex. 12, Jellison Dep. 9-11.) Jellison testified that James Lardner was terminated because there was a consolidation of routes and Jellison had to eliminate one mechanic. (*Id*. at 33-34.) Although routes were consolidated, Jellison testified that the total number of mechanics under his supervision did not decrease but that there was a net loss of one mechanic because there was an elimination of a full time equivalent of two thousand hours (one mechanic for one year) across the board. (*Id*. at 36-38.) Morche ranked 35 places higher than James Lardner on the 2009 Rack and Stack. James Lardner was called back by Otis after his October 9, 2009 termination to help out with service maintenance on an elevator machine in Bay City. (Def.'s Mot. Ex. 6, J. Lardner Dep. 9.)

James Lardner testified that he was aware that there was a slowdown in business at Otis's Detroit Office in 2009. (*Id*. at 13.) He also testified that in his opinion the FAPEs were not fairly designed because the supervisors filling them out were never with the employees and because one of the factors, technical competence, favored younger workers because the older workers were not trained on the new equipment. (*Id*. at 46-47.)

James Lardner testified that another Otis employee, perhaps one of his supervisors but he couldn't be sure, once teased him about being slow, walking up the stairs. Other than that comment, and questions regarding his intentions of retiring, none of his supervisors ever told him he was too old to perform his job duties. (*Id*. at 61-66, 79-81.) Like the other Plaintiffs, James Lardner recalled viewing the Otis safety training video that included the safety pyramid suggesting that older workers

27

were more prone to injury.  (*Id*. at 67.)

James Lardner testified that he witnessed Joe Steger comment, sometime in 2002, that he did not want black people working for him.  Lardner testified that Steger was laying off a black helper sometime in 2002 named Van Wiley but in fact was supposed to lay off another worker who was not black.  Lardner testified that Steger told him that was "all right because I don't want any blacks working for me."  (*Id*. at 73-76.)  Steger denies ever having made the remark.  (Def.'s Mot. Ex. 1, Steger Dep. 12.)

### 5.    Richard Wright

Richard Wright is African American and was 58 years old when terminated by Otis on September 9, 2009.  (Def.'s Mot. Summ. Judg. Ex. 8, August 10, 2011 Deposition of Richard Wright, Sr. 9-10.)  Wright was principally assigned to the DTW, doing traditional service work (elevators, escalators, moving sidewalks) and with some experience assisting with the control panel for the airport tram (APM).  (Wright Dep. 17-18, 59-60, 23-26.)  Wright was terminated by Phil Davis who selected Wright for termination, with input from Joe Steger, because "given the layoffs that had already occurred in 2009, [Mr. Wright] was the lowest ranked remaining Airport Mechanic."  (Def.'s Mot. Ex. 14, Davis Decl. ¶ 16.)  Following Wright's termination, Kirk Rosiek (Caucasian age 41) was transferred to the DTW to work on the APM after completing a Modernization assignment.  (Def.'s Mot. Ex. 9, Davis Dep. 198-202.)  Rosiek's transfer to the APM resulted in the reassignment of another mechanic with traditional service work experience, Yves Levesque (Caucasian age 44), to absorb Wright's traditional service work duties.  (*Id*. at 201-02.)

Mr. Wright testified in his deposition that he did not believe that either of his supervisors,

Phil Davis or John Mosella, ever discriminated against him on the basis of his age or his race. (*Id*. at 31-32, 33-34.) Regarding his claim that he had suffered racial discrimination, Mr. Wright testified that a temporary "helper" once stated to Mr. Wright that he did not have to take orders from a "nigger." (*Id*. at 35.) Apart from this comment, Mr. Wright did not recall any other racially discriminatory remarks. (*Id*. at 37.) Mr. Wright never had a conversation of substance with Mr. Steger but after Mr. Wright was terminated he was told by James Lardner that Mr. Steger had once said that he did not want any black people working for him. (*Id*. at 39-40.) Other than comments that Mr. Wright perceived to be a joke from an older co-worker, Mr. Wright never experienced remarks from Otis supervisors relating to his age or ability to physically perform his job duties. (*Id*. at 41-43.) Mr. Wright testified that he was aware at the time he was laid off that other mechanics also were being laid off and were in the same position as he - looking for call-back work. (Wright Dep. 10, 20.)

### 6.    Tony Wolf

Plaintiff Tony Wolf is Caucasian and was born on December 26, 1956. Tony Wolf was laid off on February 1, 2008, prior to the time that the other Plaintiffs were terminated and pursuant to a different 2007 Rack and Stack. (Def.'s Mot. Summ. Judg. Ex. 7, July 29, 2011 Deposition of Anton Wolf, 7.) Wolf worked on the APM (Automated People Mover/Tram) at the DTW. (*Id*. at 34.) Wolf was terminated by Phil Davis, who told Wolf that he was being laid off because of lack of work. (*Id*. at 29-30.) Davis "selected Mr. Wolf for layoff because he was the lowest ranked Mechanic on the 2007 rack and stack comparison of Airport employees. At the time of Mr. Wolf's layoff, the 2008 rack and stack meeting for the airport had not occurred and the 2008 comparative rankings were not available." (Def.'s Mot. Summ. Judg. Ex. 14, Davis Decl. ¶ 11.) "Mr. Wolfe's

29

job duties were assumed by a combination of Bert Thompson (age 42), Ed Bezy (age 50), and Michael McNally (42)." (*Id*. ¶ 12.) Mr. Thompson was an apprentice at the time and Bezy and McNally were mechanics who continued to perform their own job duties and also assumed some of Mr. Wolf's duties. (*Id*.; Def.'s Mot. Ex. 9, Davis Dep. 23-24.) Mr. Wolfe testified that he was not aware of ageist comments directed to him personally but, like the other Plaintiffs, he did watch the Otis training video that suggested that older workers were more prone to injury. (Def.'s Mot. Ex. 7, Wolf Dep. 34-35.) Mr. Wolf admitted that he was aware that the industry suffered the highest number of layoffs in history since Mr. Wolf was terminated. (*Id*. at 51-52.)

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

31

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

## III.   ANALYSIS[6]

### A.   Plaintiffs' Age Discrimination Claims

### 1.   The evidentiary framework.

The Age Discrimination Employment Act, 29 U.S.C. § 621-634 (the "ADEA") prohibits employers from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may proceed on a claim of age discrimination on the basis of direct or circumstantial evidence. "If a plaintiff cannot prove discriminatory intent by direct evidence, he may do so by making a *prima facie* case of age discrimination through indirect or circumstantial evidence." *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012). "The burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), applies in the present case because [Plaintiffs] presented no direct evidence of discrimination." *Browning v. Department of the Army*, 436 F.3d 692, 695 (6th

---

[6] Plaintiffs' Title VII and Elliot-Larsen Civil Rights Act, both as to age and race, are analyzed under the same evidentiary standards. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

Cir. 2006). Where, as here, a plaintiff lacks direct evidence and chooses to proceed on the basis of circumstantial evidence, he must prove that: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was qualified for the job; (3) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone substantially younger." *Id.* "An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the age difference is significant." *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)). An age difference of fewer than six years is not significant as a matter of law, age differences greater than ten years are generally considered significant and differences that fall between six and ten years are to be judged on a case by case basis. *Blizzard*, 698 F.3d at 284.

"[W]hen a termination arises as part of a work force reduction, the fourth element of the *McDonnell Douglas* test is modified or heightened to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Not every termination carried out pursuant to a reduction in force ("RIF") qualifies as a legally cognizable RIF:

> It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the

plaintiff's duties. *See Sahadi [v. Reynolds Chem.*],636 F.2d 1116 (6th Cir. 1980)] at 1117 ("[p]laintiff was not replaced; his former duties were assumed by Alexander, who performed them in addition to his other functions").

*Barnes*, 896 F.2d at 1465.

"If a plaintiff satisfies his burden at the *prima facie* stage, the burden of production shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination. The burden of persuasion, however, remains on the ADEA plaintiff at all times to demonstrate that age was the "but-for" cause of their employer's adverse action." *Schoonmaker*, 595 F.3d at 264 (internal citations and quotation marks omitted).

Once an employer rebuts a stated *prima facie* case with a legitimate, non-discriminatory reason for the adverse employment action, "the presumption of discrimination no longer exists, and [plaintiff] must prove that the reasons offered by the [employer] were in fact pretextual in order to prevail." *Browning*, 436 F.3d at 695.[7] "For a plaintiff to show pretext, he must show the employer's given reason for its conduct 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct.'" *Lefevers*, 667 F.3d at 725 (citing *Schoonmaker*, 595 F.3d at 268). To demonstrate pretext at the summary judgment stage, a plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation for the adverse employment action. *Schoonmaker*, 595 F.3d at

---

[7]   "When a plaintiff has established a *prima facie* case, he or she has established a 'legally mandatory, rebuttable presumption' that the defendant discriminated. A defendant escapes this presumption by articulating a legitimate reason for the action." *Barnes*, 896 F.2d at 1464 n. 7 (quoting *Burdine*, 450 U.S. at 254 n. 7).

34

268; *Browning*, 436 F.3d at 696.  The burden of persuading the trier of fact remains at all times with the plaintiff.  *Browning*, 436 F.3d at 696 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).

"An employer is entitled to summary judgment 'if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'"  *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).   A plaintiff cannot establish that the employer's stated reason for termination did not actually motivate the decision where the employer actually retained employees of roughly the same age as plaintiff.  "Lefevers has not shown that GAF's stated reason for his termination did not actually motivate the challenged conduct. The evidence that bears most strongly on this issue is that GAF retained employees near or above Lefevers's age in positions analogous to his own. . . . We have held, in similar circumstances, that there is no inference of age discrimination."  *Lefevers*, 667 F.3d at 726.

   2.   **Plaintiffs' *prima facie* case.**

Each of the Plaintiffs in the instant case has satisfied the first three prongs of the *prima facie* case.  Plaintiffs are all over the age of 40, their lay offs were adverse employment actions and they were qualified to do the work.[8] A dispute exists, however, regarding the fourth prong and more

---

[8]The Court rejects Otis's argument, presented in its briefs, that these Plaintiffs have not satisfied the second prong of the *prima facie* analysis because they were not qualified to perform their jobs.  The Otis witnesses testified unequivocally that these Plaintiffs were not terminated for performance reasons but rather were laid off due to lack of work.  Keith Hearns testified that Plaintiffs were terminated because they ranked in the bottom 25% of the mechanic workforce when the lay offs were called for; not for poor performance but for lack of work.  Betsy Ceriello testified that all of the mechanics on the Rack and Stack were qualified but that Plaintiffs, and others at the bottom of

specifically whether Otis has sufficiently established the existence of a RIF so that the Plaintiffs'

burden on the fourth prong is enhanced as required under *Barnes*.  Plaintiffs argue that Otis has not

sufficiently supported the claim that Plaintiffs were laid off pursuant to a RIF and thus argue that

their burden on the fourth prong is met if they can establish that they were replaced by persons

outside the protected class or that persons outside the protected class who were similarly situated

were not subject to the same adverse employment action.  Otis argues that they have offered

sufficient evidence that Plaintiffs were laid off along with several other mechanics due to a downturn

in Otis's business and that Plaintiffs must therefore produce "additional direct, circumstantial, or

statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for

impermissible reasons." *Barnes*, 896 F.2d at 1465.

> **a.      Plaintiffs were terminated pursuant to a RIF, so that Plaintiffs' burden on the fourth element of their *prima facie* case is heightened under *Barnes*.**

"A work force reduction situation occurs when business considerations cause an employer

to eliminate one or more positions within the company. An employee is not eliminated as part of a

work force reduction when he or she is replaced after his or her discharge. However, a person is not

replaced when another employee is assigned to perform the plaintiff's duties in addition to other

duties, or when the work is redistributed among other existing employees already performing related

work." *Barnes*, 896 F.2d at 1465.  "'Eliminating a single job is sufficient to constitute a legitimate

_____

the ranking, were simply less qualified than those in the middle and at the upper end of the ranking.
Indeed, as Plaintiffs point out in their response, as union employees the mechanics could only be
terminated for just cause and typically could not be terminated without resort to the disciplinary
process.  In the event of a lay off due to lack of work, however, the mechanics could be laid off
based on performance, skill or any other legal criteria.  (Def.'s Mot. Ex. 1, Steger Dep. 69-70.)
Once laid off, there was no criteria for who was called back.  (Def.'s Mot. Ex. 9, Davis 62-63, Ex.
12, Jellison 54.)

reduction in force.'"  *Shah v. NXP Semiconductors USA, Inc.*, No. 11-1779, 2012 WL 6013771, at

*4 (6th Cir. Dec. 4, 2012) (quoting *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 992 (6th Cir.

2009)).

Plaintiffs argue that Otis has failed to present sufficient evidence of the financial necessity

for a RIF and also failed to demonstrate that the number of mechanics actually was reduced.  In

response to Plaintiffs' discovery requests seeking evidence of the economic necessity for the RIF,

Otis produced its monthly plan to performance figures for the years 2008 and 2009, which

demonstrate that Otis failed to meet the plan goals in the majority of those months.  Plaintiffs do not

dispute the accuracy of this information but rather attack the fact that Otis did not produce other

information, such as documents reflecting "labor costs," from which Plaintiffs apparently hoped to

dispute the fact that Otis actually faced an economic need to reduce its workforce.  The Court

previously denied without prejudice Plaintiffs' motion for spoliation on this issue, finding no

evidence that Otis failed to produce the documents that had been requested or ordered to be

produced on this issue during discovery.  (ECF No. 103.)

Otis maintains that it has produced all documents and evidence on which it intends to rely

to establish the economic necessity for a workforce reduction - i.e. the performance to plan

documents and testimony regarding the overall economic downturn in the industry at the time of

Plaintiffs' lay offs, a fact to which several witnesses, including many of the Plaintiffs, testified to

during discovery.  Plaintiffs have presented no credible evidence to dispute the fact that each of the

terminations at issue in this litigation was carried out pursuant to a corporate directive to eliminate

mechanics at Otis's Detroit office due to financial concerns in the Detroit elevator market.

In support of their claim that Otis had no real need to reduce its workforce, Plaintiffs direct

the Court to a page from Otis's 2009 Annual Report, indicating that Otis employs 60,781 people across the globe and reported revenues of $11.8 billion and operating profits of $2.4 billion *worldwide* 2009. The utter lack of probative value of this evidence to the economic issues faced in Otis's Detroit office in 2009 is patently clear. Plaintiffs have not produced sufficient evidence to create a genuine issue of material fact regarding the economic necessity for a reduction in force at Otis's Detroit office in 2008-2009.

Nor have Plaintiffs presented evidence to rebut Otis's evidence that it did in fact lay off 17 of its 72 mechanics between January, 2008 and December, 2009, pursuant to an economically motivated reduction in force. Plaintiffs make the unsupported statement that in fact there was no reduction in the mechanic labor force and that the repair side of the business (the Maintenance department where Plaintiffs were employed) was not suffering the same economic downturn as the Construction and Modernization departments. (ECF No. 67, Pls.' Resp. 19). Plaintiffs concede that the evidence demonstrates a slow-down on the Construction and Modernization end of the business in the Detroit market but note that none of the Plaintiffs worked in those departments. (Pls.' Resp. 1.) Otis explained in its position statements to the EEOC that as the economy continued to decline and layoffs were needed, the "company's management made a number of transfers and re-assignments among its departments in an effort to retain as many employees as possible, particularly its superior mechanics in the Construction and Modernization departments." (Pls.' Resp. Ex. F, Excerpt from E. Lardner's EEOC Statement.) Plaintiffs argue that their terminations were not made pursuant to a bona fide reduction in force because Otis "bumped" Maintenance mechanics "in favor of Construction and Modernization refugees" as part of its workforce reduction, thus replacing Plaintiffs with other Otis employees doing related work rather than eliminating their positions.

38

The Sixth Circuit has recognized, however, that such "reshuffling" of the workforce in an effort to achieve an overall cost savings is a legitimate means of carrying out a RIF and is consistent with the mandate of *Barnes*. In *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890 (6th Cir. 1997), the Sixth Circuit reversed the district court's denial of PPG's renewed motion for summary judgment as a matter of law challenging the sufficiency of the evidence in support of the jury's verdict on plaintiff's age discrimination claim, and remanded to the district court with instructions to enter judgment in favor of PPG on plaintiff's age discrimination claim. In *Brocklehurst*, it was undisputed that PPG was seeking to reduce costs and increase profitability, in part by terminating approximately 130 employees. *Id.* at 895. Performance was to be the sole criteria for determining who would be terminated and the employees were ranked against each other to accomplish this purpose. *Id.* at 893. Brocklehurst was ranked near the bottom of employees in his peer group and therefore was identified as an employee who should be terminated as part of the RIF. *Id.* Brocklehurst was terminated and his position was filled by another PPG employee who was promoted to Brocklehurst's position following Brocklehurst's termination. The position previously occupied by Brocklehurst's replacement was filled by another PPG employee and that employee's position was left unfilled. *Id.* at 895. Concluding that *Barnes* could not be interpreted to disqualify a termination as part of a RIF if the affected employee's position is not eliminated, the Sixth Circuit held:

> PPG could not eliminate the director of marketing for the Ford and Mazda accounts. Therefore, PPG had to promote another employee to fill the vacancy left by Brocklehurst's discharge. That promotion, however, does not mean that PPG did not discharge Brocklehurst as part of its overall RIF. It is undisputed that, as part of the overall reshuffling, Brocklehurst's discharge resulted in the elimination of one employment position and accomplished cost savings for PPG, the goal of any RIF.
>
> To accept the district court's reading of *Barnes* is tantamount to saying that a business must restrict its work force reductions to employees who occupy non-essential positions. We do not believe that is the law of this circuit. We therefore

39

find that PPG terminated Brocklehurst as part of its RIF.

123 F.3d at 895.

In *Douglas v. Int'l Automotive Components Grp. North America, Inc.*, 483 F. App'x 178 (6th Cir. 2012), the Sixth Circuit applied the logic of *Brocklehurst* in a case involving a reduction in force that "reshuffled" valued employees to replace employees who were terminated following a directive to reduce costs.  In *Douglas*, the plaintiff was terminated and his position was filled by another employee who did related but not identical work but who was deemed to be critical to the upcoming launch of a particular project. *Id.* at 180.  Rejecting plaintiff's contention that the RIF was not the true reason for his discharge because his position was filled by another existing employee, the Sixth Circuit relied on *Brocklehurst* and held that the "reshuffling" of employees, which resulted in an overall cost savings, was a legitimate means to accomplish a RIF: "[T]he "reshuffling" resulted in the elimination of a position and cost savings, 'the goal of any [reduction in force].'" *Id.* at 181 (quoting *Brocklehurst*, 123 F.3d at 895) (second alteration in original).  Thus, Otis's decision to retain its more valued Construction and Modernization mechanics does not disqualify the Plaintiff's discharges as having been accomplished pursuant to a RIF.

Plaintiffs also suggest that the fact that there were rehires and even new hires after Plaintiffs were laid off indicates that there was no bona fide need to reduce the workforce.  Phil Davis testified, however, that there may have been new hires or rehires but that the overall number of mechanics definitely reduced over the relevant period of time.  (Def.'s Mot. Ex. 9, Davis Dep. 150-51).  This testimony is consistent with the documentary evidence that demonstrates that Otis employed 72 mechanics on January 20, 2009 and employed 57 mechanics on June 30, 2010. (*Compare* Def.'s Mot. Ex. 2, Steger Decl. ¶ 14, Ex. B, January 21, 2009 Rack and Stack *with* Pls.'

40

Resp. Ex. O, List of Mechanics in Detroit office as of June 31, 2010.)  This evidence is unrebutted. Plaintiffs suggest that because the number of employees in the Maintenance/Repair department did not decrease over the period that included the RIF, Otis did not in fact decrease its number of mechanics.  Otis has explained, however, that the workforce was evaluated as a whole, not just by department, i.e. Construction, Modernization and Repair, and that while there may have been a few new hires, there was definitely a greater number of layoffs overall.  (Davis Dep. 150.)

As *Brocklehurst* makes clear, evidence that Otis preferred to retain its Construction and Modernization mechanics, and to transfer some of them to the positions previously occupied by Plaintiffs, is simply insufficient as a matter of law to permit the Court to conclude that plaintiffs' terminations were therefore not pursuant to a bona fide RIF.  "[A] project-specific or employee-specific increase in work cannot rebut [Otis's] aggregate data demonstrating a companywide downturn in [elevator] work and decrease in workforce." *Copeland v. Regent Electric, Inc.*, No. 11-3478, 2012 WL 3871883, at *4 (6th Cir. Sept. 6, 2012).  In *Copeland*, just days before laying off the African American plaintiff, the employer had transferred five white employees from other projects to the plaintiff's project.  The Sixth Circuit held that even assuming another employee took on the work previously performed by plaintiff, the lay off still fell under *Barnes's* definition of a RIF:

> Regent, facing a companywide decrease in work, reduced its workforce and diverted some of its senior employees and a lower-wage apprentice to one of its work-heavy projects, laying off a junior employee instead.  Prior to the transfer, each of these five transferees performed the same sort of electrical work as Copeland on other Regent projects - four of them even held the same job title as Copeland.  Given this record, a jury could only conclude that Regent redistributed the electrical work available companywide among employees performing "related work."  Because the legal definition of "reduction in force" foreclosed the district court from inferring that a mere replacement occurred, the court correctly required "additional evidence" of discrimination.

41

*Copeland*, 2012 WL 3871883, at *6.  Plaintiffs have not attempted to establish that any of the mechanics who assumed the Plaintiffs' job duties were not previously performing "related work." The mere fact that they were elevator mechanics in different departments working on different projects does not inescapably lead to the conclusion that they were performing unrelated work. Indeed, the fact that all mechanics across all departments are ranked on the same Rack and Stack demonstrates that Otis believes their skill sets to be to some degree related or fungible.  Under the reasoning of the Sixth Circuit's decisions in *Brocklehurst*, *Douglas* and *Copeland*, Otis's business decision to redeploy its existing workforce to meet any labor demands created by its lay off decisions does not disqualify the lay offs as a RIF.

It is true that if Plaintiffs had been able to demonstrate a genuine factual dispute regarding the existence of the RIF, applying the additional evidentiary burden required in the case of a RIF would be inappropriate.  In the instant action, however, although Plaintiffs' contest the "legitimacy" of Otis's reduction in force, Plaintiffs have failed to adduce concrete evidence to dispute the "existence" of the reduction.  "Ultimately, whether one characterizes [Otis's] restructuring as a replacement or an elimination of a position, the fact that an employer facing a work shortage shifts the available work to some employees and lays off the rest (including [African Americans and older workers]) - without more - fails to establish a *prima facie* case of discrimination." *Copeland*, 2012 WL 3871883 at *7.  Accordingly, under *Barnes* and its progeny, the Plaintiffs bear the burden at the *prima facie* stage of producing additional direct, circumstantial or statistical evidence in this case that the Plaintiffs were singled out for termination because of their age.

### b.   Plaintiffs have not met their heightened burden of production under *Barnes*.

Because Plaintiffs were terminated pursuant to a RIF, they must do more than simply

demonstrate that each of them was replaced by a younger worker -- they must produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons" in order to satisfy the fourth prong of their *prima facie* case. *Barnes*, 896 F.2d at 1465.  While each Plaintiffs' claim ultimately must be analyzed individually under the *McDonnell Douglas* burden shifting framework, *see Barnes*, 896 F.2d at 1470, Plaintiffs suggest that an inference of discrimination as to the entire group is sufficiently demonstrated by certain "statistical" evidence and that this showing would satisfy the heightened fourth prong of the *prima facie* case as to each Plaintiff.[9]  In addition, Plaintiffs point to other circumstantial evidence that they assert generally demonstrates that they were targeted for termination due to their age, i.e. the alleged disparities between the FAPE values and the Rack and Stack numbers, the alleged subjectivity of the FAPEs, and a "corporate culture" that devalued older workers.

> i.    **Plaintiffs' "statistical" evidence does not tend to indicate that Otis singled Plaintiffs out for discharge because of their age.**

---

[9]  Plaintiffs do not agree that they must satisfy the heightened burden of *Barnes*, and they did not discuss this additional evidence in the context of establishing their *prima facie* case.  They simply stated in a footnote that they contest that there was an actual reduction in force since no evidence was produced to support Otis's claim of economic necessity and because "Plaintiffs were replaced and the number of workers was not actually reduced." (Pls.' Resp. 17 n. 42.) The Court has already established *supra*, that Plaintiffs did not support either of these claims with evidence of probative value sufficient to create a genuine issue of material fact that the lay offs were pursuant to a bona fide RIF.  Plaintiffs then state in the same footnote, without argument or support, that "even if the Court were to determine there was [a RIF], Plaintiffs can meet that higher standard as well."  *Id*.  The Court can only speculate as to what evidence Plaintiffs might have offered in support of their burden under the higher standard, but presumes that such evidence would overlap, to some degree, with their evidence of pretext.   "The question is not whether the proffered evidence gets the label "pretext."  It is whether the evidence - in the context of a reduction in force - shows age discrimination."  *Schoonmaker*, 595 F.3d at 268. The Court, therefore, discusses this evidence as it might relate to the *prima facie* case, and also *infra*, as it relates to the issue of pretext.

"Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class. To do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Barnes*, 896 F.2d at 1466 (citations omitted). "[B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Id.* (citing *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987)).

Plaintiffs' "statistical evidence" falls far short of the type of statistical evidence that the court in *Barnes* and in subsequent cases relied on by Plaintiffs, such as *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998), found sufficient to establish a *prima facie* case under the heightened standard applicable in a RIF. Neither the methodology nor the explanatory power of Plaintiffs' "statistical" analysis is sufficient to permit an inference of discrimination at the *prima facie* stage. *Barnes* cautioned that any data relied on to support an inference of discrimination must be from a reliable source and must be of sound methodology. 896 F.2d at 1466. Most importantly, however, unlike the statistical evidence found sufficient at the *prima facie* stage in *Barnes* and *Scott*, Plaintiffs' "statistical" evidence fails to eliminate either of the two most obvious explanations for discharge, i.e. lower proficiency and random chance, and therefore cannot create an inference of discrimination.

Unlike the expert opinion evidence considered by the courts in *Barnes* and *Scott*, none of Plaintiffs' "statistical" information is presented through the testimony of an expert and some of it is contradicted by unrebutted evidence submitted by Otis. Plaintiffs' "statistical evidence" was compiled and presented not through experts but by Plaintiffs' counsel, Darcie Brault, in briefs and

44

in a now-stricken exhibit.  Plaintiffs' "statistical evidence" contains numerous factual errors and omissions as well as faulty or unexplained methodology. For example, in support of their assertion that the terminations resulted in an overall decrease in the average age of retained mechanics, Plaintiffs assert, without any evidentiary support, that with regard to Mr. Wolf's 2008 lay off, Lawrence Kubert, a mechanic who was older than Plaintiff Wolf and ranked 2nd on the 2007 Rack and Stack (Wolf ranked 13th out of 15 - *see* Pls.' Ex. I, 2007 Rack and Stack), retired shortly after Wolf was laid off, suggesting that this fact diminishes the significance of Otis's retention of this older mechanic at the time that it terminated Wolf.  The undisputed evidence demonstrates, however, that Kubert (who is eight years older than Plaintiff Wolf) was retained when Wolf was laid off and retired on January 31, 2011, over three years after Wolf was laid off.

With respect to the remaining Plaintiffs' lay offs pursuant to the 2009 Rack and Stack, Plaintiffs attempt to derive statistical significance from a comparison of the average age of mechanics who were laid off pursuant to the 2009 Rack and Stack and not recalled with those who allegedly were newly hired or called back between 2009 and 2011.[10]  (Pls.' Resp. 6-8.)  However, in making this comparison, Plaintiffs choose selectively from the underlying data and consequently draw from that data wholly unsupported conclusions.  For example, Plaintiffs purport to compare their own Exhibits L and M to demonstrate a difference in the average age of mechanics that Otis laid off in 2008 and 2009 and did not recall and the average age of mechanics who were hired after the layoffs.  Most significantly, Plaintiffs fail to explain why this comparison has any probative value on the issue of Otis's intent to single out the Plaintiffs for termination during the 2009 RIF.

---

[10] It is important to note that it is undisputed that Otis was under no obligation, contractual or otherwise, to recall or rehire mechanics who were laid off due to lack of work.  *See infra* discussion at 67-68.

45

In any event, Plaintiffs misreport the underlying data. For example, on the "new hires" side of the equation, the chart includes two new hires, Russo and Harmon, aged 48 and 44 respectively, who do not appear on Exhibits L or M but appear on Exhibit P and were not hired until July and August, 2011, respectively. Also missing from the new hire side of the chart, just by way of another example, is Michael Kaneski, who was 60 years old at the time he was hired by Otis following Plaintiffs' terminations. (Steger Dep. at 251.) On the "layoff and not recalled" side of the chart, Plaintiffs fail to include from Exhibit L (which they claim to be the underlying data for the chart summary) Kenneth Harlan (48), John Watson (47) and Gregory Putnam (52), who appear on Exhibit L as having been laid off and not recalled.

Plaintiffs make no effort to describe the reason, if any, for these omissions and make no effort to describe the relevant time frame for their comparisons or to explain what factors, e.g. changes in business conditions or qualifications of the new hires, etc., might have prompted Otis to hire new mechanics and not rehire Plaintiffs two years after Plaintiffs were terminated. *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (finding plaintiff's statistical evidence regarding the ages of new hires doomed by the failure to provide evidence regarding the qualifications of the new hires, noting that "employee statistics unaccompanied by evidence regarding qualified potential applicants from the relevant labor market . . . lacked probative value").

Plaintiffs also make sweeping and unsupported statements regarding three older workers (JP Lagaeuex (DOB 1947), Warren Morche (DOB 1945), and Jim Whims (DOB 1947)), who were retained by Otis during the RIF, citing their "impending retirements" as a reason to ignore their ages in the "statistical" presentation of data. (Pls.' Resp. 7 n. 23.) Plaintiffs only speculate about the fact of these retirements and offer no evidence that Otis knew at the time that it retained these three older

46

workers (all of whom not unimportantly were ranked significantly higher than Plaintiffs on the 2009 Rack and Stack) were planning to retire on any date certain or that their retirement plans in any way figured into Otis's rankings.  In fact, Plaintiffs' own Exhibits indicate that none of the three retired until a year to eighteen months after Plaintiffs were terminated.  (Pls.' Resp. Ex. M.)  Also noteworthy is the fact that of the six new hires on Plaintiffs' chart, three are 48 or older, further undercutting Plaintiffs' claim that Otis preferred to employ younger mechanics, outside of the Plaintiffs' protected class, i.e. forty years of age and older.

Plaintiffs' statistical evidence is plagued by several critical inaccuracies or omissions of data, and also fails to adequately explain the underlying significance of the comparisons it invites the Court to draw.  The Court notes that it is Plaintiffs' burden, at the *prima facie* stage, to produce evidence that tends to indicate that the Plaintiffs were singled out because of their age.  Plaintiffs made the choice not to utilize experts to present their statistical data and their efforts to support an inference of discrimination based on "statistics" have yielded confusing and inherently unreliable results.  It is not incumbent on the Court to go searching the record for data to try and establish Plaintiffs' *prima facie* case; this is Plaintiffs' burden.

Even assuming the accuracy of the data and the soundness of the methodology (neither of which the Court can presume), Plaintiffs fail to explain the probative value of comparing the average age of those laid off and not recalled to the average age of Otis's new hires in the months and years following the Plaintiffs' terminations.  Importantly, Plaintiffs never adequately rebut the affidavit testimony of Betsy Ceriello that "as of August 31, 2008, approximately 65% of the Mechanics and Apprentices in Detroit were over 40 years old.  As of January 31, 2010, approximately 74% of the Mechanics and Apprentices in Detroit are over 40 years old."  (Def.'s Mot. Ex. 17, Ceriello Aff. ¶

47

8(a).) Plaintiffs' only rebuttal to this evidence is the accusation that "Otis lumps together Mechanics and Apprentices to support its claim that Otis went from 65% to 74% of employees over forty after the layoff." (Pls.' Resp. 1.) Plaintiffs do not explain why including Apprentices renders the statistic unreliable. Ceriello includes the apprentices on both sides of the equation, i.e. she is comparing apples to apples, so the Court is hard pressed to see the significance of Plaintiffs' rebuttal on this point. Nor do Plaintiffs proffer an alternate more telling comparison, *e.g.* the percentage of mechanics over 40 years old both before and after the RIF, or for that matter any other potentially probative comparison.[11] Simply put, the methodology and explanatory power of Plaintiffs' "statistical" evidence is insufficient to support an inference of discrimination. *Simpson*, 823 F.2d at 944; *Barnes*, 896 F.2d 1469 n. 20.

Even if this statistical evidence did demonstrate some significant disparity that tended to indicate that these Plaintiffs were singled out because of their age, the evidence must also "eliminate

---

[11] Although neither Plaintiffs nor Otis endeavors to compare the average age of the mechanics laid off pursuant to the RIF to the average age of the mechanic workforce before the RIF, a comparison that has been found to be significant in other RIF age discrimination cases, the Court's cursory effort at such a comparison, based on the mechanics listed on the 2009 Rack and Stack and the birth date information provided by Plaintiffs (approximated by the Court for purposes of the comparison without distinction as to which month of the given year the mechanic was born), discloses that the average age of the 16 mechanics who were laid off as part of the RIF was approximately 50 and the average age of the mechanic work force prior to the RIF was approximately 47. This difference in ages, standing alone, would not be significant enough to support an inference of age discrimination. *See Benders v. Hecht's Dep't Stores*, 455 F.3d 612, 622 (6th Cir. 2006) (finding the difference between an average age before RIF of 41.7 and an average age of those terminated pursuant to the RIF of 43.4 "slight" and not significant). In *Scott, supra*, the Sixth Circuit found an almost seven year disparity to be significant but in that case the statistical evidence, which significantly was presented through two economists, also demonstrated a less than 1% chance that the disparity was due to randomness. *Scott*, 160 F.3d at 1129. No such expert statistical proof has been offered in this case. Moreover, since *Scott*, the Sixth Circuit has ruled that, in the context of meeting the fourth prong of the standard *prima facie* age discrimination case, i.e. that the plaintiff was replaced by a substantially younger worker, a difference of less than six years is legally insignificant. *Blizzard,* 698 F.3d at 284 (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)).

the most common nondiscriminatory explanations for the disparity." *Barnes*, 896 F.2d at 1466.  In

*Barnes*, the Sixth Circuit found that plaintiffs' statistical evidence (importantly presented through

expert reports) satisfied this requirement at the *prima facie* stage based on a presumption (in the

absence of any evidence to the contrary) that all of the employees were equally qualified:

> Since all of the discharged employees are arguably qualified in work force
> reductions, the most obvious explanations for the discharge of any one employee are
> lower proficiency and/or random chance. Since it is reasonable to presume at this
> stage of the case that skill is distributed randomly over any given age group and
> since the plaintiffs have shown that the results depart significantly from those that
> chance alone would predict, we believe that the statistics, on their face, establish a
> *prima facie* case of discrimination.

*Barnes*, 896 F.2d at 1467.  In permitting statistical evidence to suffice to establish a *prima facie*

case, the court in *Barnes* explained: "We allow a plaintiff to establish a prima facie case [based on

statistics] without additional evidence that bias is the more likely cause of the discharge than

legitimate explanations because we assume, absent some reason to believe the opposite is true, that

job skills will be equally distributed across all age groups."  896 f.2d at 1469.  In the instant case,

even assuming that Plaintiffs' statistical evidence demonstrated a significant disparity, the Rack and

Stack ranking of employees based on performance is evidence that skill in this case is not equally

distributed.  This negates Plaintiffs' ability to draw an inference of discrimination at the *prima facie*

stage based on statistics alone because relative lower proficiency (one of the two most "obvious

explanations" for discharge of an employee) has been demonstrated through the Rack and Stack

process.[12]  Nor have Plaintiffs even attempted to demonstrate that statistically any alleged disparities

---

[12] The Sixth Circuit in *Barnes* found plaintiffs' statistical evidence sufficient at the *prima facie* stage
because there was no reason in that case to assume that the job skills were not evenly distributed
among all employees, i.e. defendants there presented nothing comparable to the Rack and Stack.
Notably, however, the court rejected the sufficiency of the statistical evidence at the pretext stage
as applied to the plaintiffs as a group.  The court noted that a defendant may defeat a *prima facie*

deviated from what random chance would predict. *See Barnes*, 896 F.2d at 1466; *supra* note 11.

Plaintiffs, however, would have the Court disregard the Rack and Stack ranking of mechanics because they claim that the Rack and Stack itself was manipulated to target older employees for lay off. Thus, Plaintiffs would argue that at the *prima facie* stage, the most common basis for discharge, i.e. relative lower proficiency, has not been demonstrated and that, as in *Barnes*, the Court should assume that job skill was evenly distributed. But *Barnes* suggests that in the face of evidence that job skill was not equally distributed, statistical disparities cannot suffice to establish a *prima facie* case. While the integrity of the Rack and Stack is addressed at greater length in the Court's discussion of the issue of pretext, Plaintiffs have not presented sufficient evidence to support a claim that the Rack and Stack was manipulated and utilized as a tool to target these Plaintiffs for termination. In other words, Plaintiffs' attack on the Rack and Stack does not serve to eliminate the most obvious non-discrminatory reason for their discharge, i.e. the RIF and the Rack and Stack.

This Court has already ruled that Exhibit U, prepared by Ms. Brault and offered as a Federal Rule of Evidence 1006 Summary in support of Plaintiffs' response to Defendants' motion for summary judgment, be stricken. (ECF No. 103, Order Striking Exhibit U.) While the Court would not typically address the contents of a stricken exhibit, it does so here for the limited purpose of demonstrating that the very document prepared by Plaintiffs' counsel to demonstrate ageist bias in the Rack and Stack in fact demonstrates that any disparities in the Rack and Stack are in fact age-

---

case established by statistics by (1) demonstrating that the statistical method is faulty, or (2) that job skills are not evenly distributed, or (3) even if the statistics indicate bias, demonstrate that bias did not play a role in the particular decision to discharge each plaintiff. In the instant case, even assuming Plaintiffs could establish a *prima facie* case with their statistics, the statistics would fail to support a claim of pretext because Otis has established both (1) and (2). *See infra*, discussion at (III)(A)(3).

neutral.

In her stricken Exhibit U, Ms. Brault attempted to demonstrate that the Rack and Stack process was "manipulated" to the "disadvantage of the older workers." (Pls.' Resp 21-23.) In an effort to demonstrate that the Rack and Stack was a sham document used to target older workers for lay off, Ms. Brault attempted to document disparities between the Plaintiffs' FAPEs and their rankings on the Rack and Stack. It is undisputed that where Ms. Brault did not have sufficient information regarding a particular mechanic's FAPE scores, she simply excluded them from her charts. Ms. Brault's "chart" setting forth the sort by disparity and birthdate includes information on only 45 of the 72 mechanics ranked on the 2009 Rack and Stack. Although she lacked FAPEs for seven of the 72 mechanics, this does not explain why her disparity conclusions do not include all of the remaining mechanics for whom she did have FAPE data. For some unexplained reason, some individuals for whom Otis did provide FAPEs, and who appear on Ms. Brault's master list (her Exhibit 2 to Exhibit U), do not appear in her disparity or birth date sorts (her Exhibit 4 to her Exhibit U). As a result, the explanatory power of the entire Exhibit is necessarily compromised and insufficient to support an inference of discrimination. For this reason alone, the methodology employed to compare the disparities in the mechanics' scores is not sufficient to infer discriminatory intent, even were the Court to accept Ms. Brault's comparisons as a pedagogical aid.

Finally, even if comparisons of disparities between FAPE scores and Rack and Stack scores were accurately drawn and presented on stricken Exhibit U, the Court's own random sampling of several employees' scores, young, old and in between, demonstrates that, despite Plaintiffs' claim otherwise, there is no particular ageist pattern to the distribution of the disparities. It appears that in several instances, across several age groups, the scores entered on the Rack and Stack were lower

than they would have been had they been transposed directly from the FAPEs.  This result is consistent with the testimony of several Otis supervisors who explained that discussions took place at the Rack and Stack meeting and that changes could be made based on the collective opinion of the group.  Also, as Phil Davis and Keith Hearns both testified, the fact that the FAPE scores had no numeric values resulted in multiple fractional scores being entered on the Rack and Stack.  A selection of the disparities noted by the Court is as follows:  The Plaintiffs: Ray Anderson (53, 12 full decreased scores)[13], Richard Wright (59, 4 full decreased scores, 4 half point decreases, 1 increased score), Earl Lardner (57, 8 full decreased scores, 2 half point decreases, 1 increased score), Ralph Brown (51, 6 full decreased scores, 5 half point decreased scores), Jim Lardner (53, 4 full decreased scores, 2 increased scores), Tony Wolf (52, 2 full decreased scores, 5 half point decreased scores).  Other randomly selected employees: Roy England (47, 6 full decreased scores, 2 half point decreased scores), Yves Levesque (45, 1 full decreased score, 10 half point decreased scores), Jim Smith (44, 8 full decreased scores), Kevin Frush, Jr. (37, 3 full decreased scores, 3 half point decreases, 1 increased score), Dusty Stacey (37, 5 full decreased scores, 4 half point decreases), Cliff Tomlin (54, 8 full decreased scores), Kerry Kimlin (48, 6 full decreased scores, 1 half point decreased and 1 increased score), Dirk Knebler (40, 7 full decreased scores), Jim Whims (62, 10 full decreased scores), Jean Legueux (62, 6 full decreased scores, 1 increased score), John Avery (54, 6 full decreased scores, 5 increased scores).  Importantly, among those mechanics who had the least disparity between their FAPEs and their Rack and Stack score, several were in their early to late

---

[13]  In parentheses appears the mechanics age in 2009 and the number of entries on the Rack and Stack that differed from that mechanic's 2009 FAPE. Some of the changes were one-half of a point, some were a full point. In making these observations, the Court compared the figures on the January 21, 2009 Rack and Stack (Def.'s Mot. Ex. 2, Steger Decl. ¶ 14, Ex. B) for the listed mechanic to the values on the 2009 FAPE Summary (ECF Nos. 115, 116) for that mechanic.

fifties, close in age to the Plaintiffs, *e.g.* Kevin Frush, Sr. (57, 1 full decreased score), Jamie Linford (52, 4 decreased scores and 6 increased scores), Dave Collins (51, no decreased scores), John Frank (50, 1 decreased score).

At the hearing on this matter, when the Court directed Plaintiffs' counsel's attention to this pattern of disparities that appeared across all age groups, Counsel conceded that the disparity data she compiled really only demonstrated that "there were huge disparities with respect to a lot of workers," and that the ranking process was therefore inherently flawed. (ECF No. 120, Transcript of Feb. 7, 2013 Hearing on Defendant's Motion for Summary Judgment 28.) Accordingly, Plaintiffs concede that the "disparity data," even assuming it were fully and accurately presented (which it is not), reflects, if anything, that across the board the Rack and Stack was not an accurate reflection of an individual employee's actual performance. Consequently, Plaintiffs question Otis's business judgment in relying on the Rack and Stack as a tool for selecting employees for lay off. (*Id.* at 30.) It was clear from counsel's remarks at the hearing on this matter that Plaintiffs' principal grievance is with the alleged subjectivity of the FAPE process and they question Otis's utilization of the FAPEs as a baseline for creating the Rack and Stack. As counsel stated at the hearing: "So this whole idea that the FAPE – FAPEs are supposed to provide the foundation for making relative comparison is already on very tenuous ground because it's not something that they can make subjective evaluations on." (Hr'g Tr. 32.) Plaintiffs would have preferred if Otis evaluated the Plaintiffs using the "OMMS," an "electronic system designed to show how they get to their routes, what they do on their routes, how much time they spend, make sure everything is completed, and that is completely objective . . . ." (Hr'gTr. 33.)

This is not an age specific complaint – this is an attack on Otis's business judgment and

applies across the board to each mechanic, young or old, who was evaluated under these allegedly subjective guidelines.  As discussed *infra*, there was nothing inherently ageist about the FAPE factors and Otis's decision to use the FAPEs as a basis for creating the Rack and Stack was a business judgment that cannot be relied upon by Plaintiffs to demonstrate pretext.  It is well established that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 595 (6th Cir. 2003) (internal quotation marks and citation omitted).

Because it is undisputed that mechanics of all ages had their scores adjusted, there is simply no basis to infer from any disparities between the FAPEs and the Rack and Stack that those disparities were age related.  Plaintiffs offer no evidence that Otis lacked an honest belief that the Rack and Stack was a valid reflection of relative employee performance.  It is undisputed that Otis did in fact rely on the  Rack and Stack rankings (in addition to other criteria in some instances) as a tool in the process of selecting mechanics for lay off.  Indeed, this is Plaintiffs' central complaint. Plaintiffs may question whether the Rack and Stack was an accurate reflection of employee performance with regard to any ranked mechanic, but they have offered no basis on which a reasonable juror could conclude that Otis did not in fact rely on the Rack and Stack or that it lacked an honest belief that the Rack and Stack could be used as a tool for comparing the relative skill sets

54

of its mechanics.[14]   Accordingly, in this case, Plaintiffs' statistical evidence fails to eliminate the most common non-discriminatory reasons for discharge and therefore Plaintiffs' statistical evidence fails to establish a *prima facie* case of discrimination.

### ii.   Plaintiffs' additional circumstantial evidence does not tend to indicate that Otis singled Plaintiffs out for discharge because of their age.

Plaintiffs also suggest that the subjectivity of the FAPEs serves as circumstantial evidence of discriminatory motive.   The subjectivity of the FAPEs is as irrelevant in this case as it was in *Browning*, *supra*.   As in *Browning*, Plaintiffs "at most contend[] that [Otis] undervalued [their] skills and experience" but provide no evidence of a "a link between the subjective matrix criteria and any discriminatory intent by [Otis]."   436 F.3d at 697.   In other words, Plaintiffs do not contend that the performance factors that supervisors are required to evaluate on the FAPEs , i.e. ethics, focus on customer needs, customer relationship building, technical expertise, etc., in and of themselves

---

[14] Plaintiffs continue to advance their theory that the Rack and Stack was supposed to perfectly align with the FAPEs in every instance and that because they did not align, Joe Steger, the keeper of the Rack and Stack document, must have secretly changed the numbers after the January, 2009 Rack and Stack meeting to target older workers for layoff.  (Hr'g Tr. 29.)  As discussed in greater detail *infra*, there is absolutely no evidence that this happened.  The Court has already denied Plaintiffs' motion for spoliation sanctions which they sought based upon allegations that Joe Steger destroyed the metadata that would have proved that he singlehandedly manipulated the Rack and Stack to target older workers.  No reasonable juror could conclude, based on Plaintiffs' sheer speculation, that this ever happened.  Moreover, there is consistent and unrebutted evidence, in the testimony of Davis, Jellison, Hearns, Olney and Ceriello, that offers a credible and unrebutted explanation, i.e. that numeric values that differed from the FAPE ratings were in fact agreed upon and entered on the Rack and Stack after discussion among the supervisors at the Rack and Stack meeting.  Ceriello testified that disparities between FAPEs and the Rack and Stack were likely exaggerated on the 2009 Rack and Stack because it was the first time that the supervisors from the three departments had to get together to rank their mechanics against each other.  On this point, Plaintiff has created at best a weak question of fact and Otis has presented consistent and unrebutted evidence to the contrary.  *See Chen*, *supra*. Earl Lardner presents the closest case for finding a genuine issue of material fact on this issue as his supervisor, Greg Testolin, testified that he expressly recalled that his FAPE scores for Earl Lardner were not changed at all on the 2009 Rack and Stack.  This factual dispute, which is specific to Earl Lardner, is discussed in greater detail *infra* in section (III)(A)(4)(a).

disfavor older workers. *See Grano v. Dep't of Dev. of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) (finding that the question "is whether the subjective criteria were used to disguise discriminatory action"). Whether Plaintiffs agree with the subjective nature of the FAPE process, or believe that they are more qualified than their FAPEs reflect, is "irrelevant to the age-discrimination inquiry - what matters is [their supervisor's] perception of [their] qualifications." *Browning*, 436 F.3d at 698. Absent a challenge to the underlying criteria used in the evaluation process, employers are free to make wholly subjective, unpopular and imperfect decisions. *Id*.

Plaintiffs rely on *Scott v. Eastman Chemical Co.*, 275 F. App'x 466, 476 (6th Cir. 2008) for the proposition that subjective evaluations must be "carefully scrutinized" to guard against their use as a mechanism for discrimination, particularly where the decisionmakers are not members of the protected group. However, the Sixth Circuit in *Scott* also noted that the use of subjective criteria is permissible and ultimately decided that even under careful scrutiny, Eastman had articulated a non-discriminatory reason based on both subjective and objective criteria for not promoting the plaintiff. *Id*. at 477.[15] Although Plaintiffs suggest that somehow the subjective nature of the evaluation process in and of itself discriminated against older employees, as in *Scott*, Plaintiffs here have failed to present any evidence that the FAPE process itself was biased against older workers. No Plaintiff testified to a belief that his direct supervisor who completed his FAPE discriminated against him because he was old. Plaintiffs testified to their belief that the FAPE process was

---

[15] Interestingly, also in *Scott*, as in the instant action, the plaintiff sought an adverse inference based upon the fact that some of the underlying documents supporting the spreadsheets on which Eastman relied in passing plaintiff over for promotion were missing. The court in *Scott* rejected plaintiff's spoliation argument and refused to allow an adverse inference where there was no record evidence, such as deposition testimony or affidavits, showing that the relevant documents had been destroyed intentionally, in bad faith or for an improper purpose. So too here, as the Court ruled in its earlier Order denying Plaintiffs' motion for spoliation.

"bogus" and "arbitrary" and that the supervisors were able to make the evaluation "anything they wanted it to be." (Pls.' Resp. 10.) There is no evidence, however, that the arbitrariness of the FAPE process targeted older workers. No evidence that, for example, the performance criteria that were utilized on the FAPEs inherently disfavored older workers. Indeed, the thrust of Plaintiffs' case is that the numbers from the FAPEs were more favorable to these Plaintiffs than the 2009 Rack and Stack scores and that somehow the Rack and Stack scores were manipulated (lowered) by someone (Plaintiffs infer Joe Steger) from the higher scores that the supervisors actually entered on the FAPEs. Plaintiffs argue that the 2009 Rack and Stack, not the FAPEs, was used as a pretext for discrimination. Plaintiffs contradict themselves when they assert that the FAPE process itself discriminated against older workers while at the same time arguing that the Rack and Stack was manipulated to lower the scores that supervisors actually entered on their FAPEs. In fact, there is no evidence that the Plaintiffs ever challenged the FAPE process as being targeted to award lower scores to older workers. (*See, e.g.* Def.'s Mot. Ex. 8, Wright Dep. 31.) In fact Plaintiff Wright testified that he did not believe that either of his supervisors ever discriminated against him because of his race or his age. (Wright Dep. 31-32.)

Plaintiffs also complain that the FAPEs were not reliable because the supervisors doing the evaluations were not themselves mechanics or did not visit the worksites often enough. Plaintiffs provide no evidence, apart from the opinions of the Plaintiffs, regarding the qualifications of the supervisors who performed the evaluations and thus has provided no factual support for this claim. Moreover, even if true, this would not serve as evidence of discriminatory intent as this same failing would be true with regard to each mechanic, regardless of his age or race.

Finally, Plaintiffs argue that discriminatory intent can be inferred from a "corporate culture

that devalued older workers in favor of younger ones." (Pls.' Resp. 19-20.)  In support of this assertion, Plaintiffs point to (1) a safety training video, (2) comments made by co-workers or supervisors regarding "old timers" or "old men," and (3) questions posed to Plaintiffs regarding when Plaintiffs anticipated retiring.

The undisputed evidence demonstrates that the safety training video shown by Otis on several occasions instructed that *both* new workers (due to lack of training/skill) and older workers (due to complacency, not age) were statistically more likely to be involved in work-related accidents.  (Def.'s Mot. Ex. 9, Davis Dep. 227-28.)  Plaintiffs mischaracterize Phil Davis's testimony on the topic of the safety video which, read in its entirety, in fact clearly supports Otis's position that the safety video is not age-related at all.  In pertinent part, Mr. Davis testified as follows:

Q:    Did you ever hear anybody at Otis claim that older workers were less safe and more prone to injuries?

A:    Yes.

Q:    Who said that?

A:    I don't know who specifically.  There was a slide that we referred to repeatedly within our safety meetings.  It was kind of a pyramid.  It showed the higher - based on level of experience or number of years of service and age, we found, based on accidents, that there was typically higher level of accidents at that age or experience level.

Q:    Do you remember being in safety meetings and mechanics listening to or hearing that discussion about that pyramid on the video?

A:    Sure.

Q:    Do you remember hearing comments made about age at the time of those meetings?

A:    No.

58

Q:     Do you recall some of the older workers saying, "I've never had an accident," or things to that effect?

A:     Sure.

Q:     Do you recall that there was some disbelief that that was true, if they were older that they would be more prone to injury?

A:     They had the opinion, but we would show them accidents and statistics that would prove that.

Q:     Did you have any involvement in actually gathering those statistics to that data?

A:     No.

Q:     You would just go by what they had on the video?

A:     Yes. The slides, yes.

Q:     And actually it didn't show that older workers were more prone to injuries compared to brand new workers, it just said that there was an increase in injuries as people got older.

A:     Right. We made the same comments with relation to young and inexperienced workers.

Q:     Right. Do you remember any of the people who you watched the video with saying, making comments like, "Oh, we better get rid of them before they get to that point," or something like that?

A:     No. The message always was based on the more years of experience you have to be aware of complacency issues.  And that was typically the message that we would portray to the mechanics and apprentices.

Q:     In terms of your discussions with people in those meetings, was there any doubt in your mind that the older workers felt that they were being targeted unfairly by that statistical information the way that it was presented?

A:     No.

Def.'s Mot. Ex. 9, Davis Dep. 226-28.

     Plaintiffs seize on the last question and answer in this lengthy discussion and represent that

59

Mr. Davis "knew" that the older workers felt they were being singled out and targeted by the video. In fact, Mr. Davis denied ever hearing anyone make the remark about "we have to make sure they don't get to that point." Taken in its entirety, Mr. Davis's testimony on the subject of the video clearly explains that the video targeted the young and the old alike, and that the complacency at which the video was directed was a function of years of experience, not just age. Plaintiffs should not be permitted to "rely on the answer to an isolated and ambiguous question to create an issue of fact for trial." *Barnes*, 896 F.2d at 1474.

The Court concludes that this safety video simply is not age-related at all and certainly cannot serve as a basis to infer a corporate culture to devalue old workers. Plaintiffs do not even attempt to challenge the integrity of the statistics in the safety video and there is no basis to doubt that the video presented an accurate statement of workplace accidents occurring most frequently in the younger (less experienced) and older (more complacent) populations of employees. Perhaps Plaintiffs took offense or disagreed but there is nothing ageist in such a message and no Plaintiff ever complained to management about the content of the safety video prior to filing this lawsuit.

Plaintiffs also support their claim of a corporate culture that devalued older workers with evidence of remarks allegedly made about "old men" or "old timers" or questions put to them about their plans for retirement.[16] Plaintiff Wright testified that there were "always a lot of jokes about

---

[16] Plaintiffs also claim that "the culture of Otis shifted" in the early 2000's when Otis changed their agreement with the Union so that mechanics could retire at 58 instead of 62. Again, Plaintiffs misrepresent the testimony of Betsy Ceriello to support this assertion. In fact, at the page cited to in Plaintiffs' brief as support for this assertion, Ms. Ceriello testified that the change in retirement age would not be a subject of collective bargaining but would be done through a trust that she was not involved with and that she did not have any recollection that the retirement age changed from 62 to 58 in 2002. (Def.'s Mot. Ex. 16, Ceriello Dep. 155.) Plaintiffs' claim about the culture changing due to a lowering of the retirement age is entirely unsupported by the cited testimony and is insufficient evidence of discriminatory intent. David Kuras, the business agent for the local

being old" and that some of the comments were made by John Mosella, a supervisor who was

actually older than Plaintiff Wright.  (Def.'s Mot. Ex. 8, Wright Dep. 42.)  Wright testified that he

always perceived these comments as jokes and that no one, not a coworker or a supervisor, ever told

him that his value to the company was decreasing as he got older.  (Wright Dep. 41-42.)  Plaintiff

Brown testified that sometime in 2000 or 2001 (Brown would have been 42 or 43 at the time) Brian

Stockman (about Brown's age) and John Mosella (older than Brown) presented Brown with a yellow

bow tie and made him put it on for a picture and said "this is what the old timers at Otis used to wear

and we're going back to this uniform, they took that picture and they posted it in the train

maintenance area."  (Def.'s Mot. Ex. 4, Brown Dep. 34.)  Brown thought it was silly and "laughed

a little," but perceived that they were belittling his age.  (*Id*. at 34-35.)  Brown never filed a

complaint about the incident and never had a further conversation with Mosella or Stockman about

the incident.  (*Id*. at 37.)  Brown also testified that when his co-worker John Marshal retired leaving

Brown as the oldest person working on the train, the foreman Carey Bailey and John Mosella made

---

bargaining unit, testifies in his Declaration that the retirement age was lowered from 62 to 58 "four
contracts ago."  (Pls.' Mot. Ex. Q, January 24, 2012 Declaration of David Kuras.)  This is not
probative of what Ms. Ceriello knew or about the culture at Otis changing when the retirement age
changed.

Similarly Earl Lardner's personal belief that Otis began recruiting members coming out of
the military in the early 2000's, which he perceived resulted in a change in the corporate culture at
Otis favoring younger employees, is just that - a personal belief based on opinion and not on
personal knowledge.  (Pls.' Mot. Ex. C, April 15, 2012 Declaration of Ear Lardner.)  In fact,
Lardner's Declaration states that his opinion is based on unspecified "data" that he was provided.
Lardner's Declaration is insufficient to create a genuine issue of material fact on the issue of whether
there was a corporate culture at Otis that devalued younger workers. *Flagg v. City of Detroit*, 827
F. Supp. 2d 765, 775 (E.D. Mich. 2011)  ("subjective beliefs, unbacked by facts within the personal
knowledge of the witness, cannot assist Plaintiffs in withstanding summary judgment"); *Tenneco
Auto. Operating Co., Inc. v. Kingdom Auto Parts*, No. 08-10467, 2009 WL 1438834, at *7 (E.D.
Mich. May 18, 2009)  ("Witness statements must be made on personal knowledge, and not on
information and belief.").

comments after that time criticizing Brown's age and how fast he could move and "things like that." (*Id.* at 36-37.)  Plaintiff James Lardner recalled that "Otis employees," (he could not name anyone and did not recall any specific Otis supervisor ever making such a comment) would make remarks to him about being too old to walk the stairs.  (Def.'s Mot. Ex. 6, J. Lardner Dep. 61-62.)  Mr. Lardner also testified that he did walk up the stairs with a perceptible limp as a result of a car accident in 2008.  (*Id*. at 68.)  J. Lardner also testified that Greg Testolin (Testolin was older than J. Lardner and was not his supervisor) would "always ask," when he happened to visit Lardner's site and the two were in the coffee room having a cup of coffee, when Lardner was going to retire.  (*Id.* at 81-83.)

The Court need look no further than the case on which Plaintiffs rely to conclude that these isolated instances of alleged discriminatory remarks by co-workers and immediate supervisors, even if made, do not amount to evidence of a corporate culture that devalues older workers. "Discriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time." *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 357 (6th Cir. 1998).  However, not every "ageist comment by a corporate executive is relevant as evidence of a discriminatory corporate culture. Rather, the courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Ercegovich*, 154 F. 3d at 356-57 (internal citations and quotation marks omitted).

Plaintiff Wright testified that he always perceived the comments by John Mosella or others

about being old as jokes and that he never believed that either of his supervisors, Phil Davis or John Mosella, ever discriminated against him because of his age.   The purpose and content of these alleged remarks, therefore, do not evidence discriminatory intent.   Plaintiff Brown testified that some time in 2000 or 2001 he was made to wear a bow tie like the old Otis employees used to wear and to pose for a picture that was displayed in the mechanics' break room.   First, this incident is too far removed temporally from Brown's termination in August, 2009 to be probative on the issue of the corporate culture nine years later.   Moreover, the purpose and content of the remark, i.e. having a 42 year old dress up in the uniform of an Otis mechanic from an earlier era, doesn't necessarily suggest anything about a corporate culture that devalues older workers.   Brown himself thought the incident was "silly" and never complained to management.   *See Levy v. Mercantile Stores Co., Inc.*, 168 F.3d 490, 1998 WL 808215, at *4 (6th Cir. 1998) (table case) (finding remarks like "old timers" were "either ambiguous or totally innocuous" and not evidence of "ageist animus").   Brown's testimony that Carey Bailey and John Mosella made comments sometime in 2007 about Brown being the oldest worker left after Harry Marshall's retirement similarly lack probative value because neither of these individuals was high enough in the corporate hierarchy for their remarks, even if uttered, to be probative of a "managerial policy" or "corporate culture," and the incident occurred over two years before Brown was laid off in August, 2009.

James Lardner was unable to name anyone in specific who commented about his being too old to walk up the stairs and therefore this alleged statement cannot even be analyzed under *Ercegovich* framework.   In addition, Lardner testified that he did walk with a limp as a result of a car accident, which would explain why coworkers may have commented on his gait.

Finally, comments inquiring about "retirement plans" over coffee without accompanying

comments pressuring the employee to retire are insufficient. *Wilson v. Reliance Trading Corp. of America*, 208 F.3d 216, 2000 WL 282357, at *1 (6th Cir. 2000) (table case) (finding that casual inquiries about retiring made well before plaintiff retired that "were not constant or done in a way that put pressure on plaintiff to retire" were insufficiently probative of discriminatory intent). Plaintiffs have failed to establish that Otis promoted a culture that devalued older workers in favor of younger workers. The statements and incidents allegedly evidencing such a corporate culture are too isolated, too remote, or too innocuous to be probative of a general corporate attitude of ageist discriminatory intent.

> **c.  Plaintiffs have produced insufficient additional evidence to satisfy *Barnes* and therefore fail to state a *prima facie* case of discrimination.**

For the reasons stated above, the Court finds that Plaintiffs have failed to produce sufficient direct, circumstantial or statistical evidence to meet their heightened burden under *Barnes*.[17] Accordingly, the Court concludes that Plaintiffs, therefore, have failed to state a *prima facie* case of age discrimination in the face of Otis's RIF, and GRANTS Otis's motion for summary judgment on Plaintiffs' age discrimination claims. However, even assuming for the sake of argument that Plaintiffs' additional evidence were sufficient under *Barnes*, they have failed to demonstrate pretext either as a group or as to any of one of them. *See infra* Section III(A)(3).

> **d.  Even assuming that there was no bona fide RIF, at a minimum Plaintiffs Wolf, Anderson and Brown have failed to meet the fourth prong under even the less exacting, non-modified *prima facie* test.**

---

[17] While the Court has analyzed the *prima facie* case as to the Plaintiffs collectively, for the same reasons discussed *infra* at section IIIA3-4, each Plaintiff, with the possible exception of Earl Lardner, also would fail to state a *prima facie* case individually. Lardner, however, cannot demonstrate pretext and his claims fail for that reason even assuming he could establish a *prima facie* case.

"An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the age difference is significant." *Blizzard*, 698 F.3d at 283.  Under established precedent in the Sixth Circuit, an age difference of fewer than six years is not significant as a matter of law, age differences greater than ten years are generally considered significant and differences that fall between six and ten years are to be judged on a case by case basis:

> This court established a bright-line rule in *Grosjean* when it held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Id*. at 340. However, while an age difference of ten or more years is generally considered significant, *id*. at 336, replacement of the employee by a person who is six to ten years her junior must be considered on a case-by-case basis. *Cf. id*. at 340 (explaining that bright-line rule "does not encroach on our precedent holding that eight years can be a significant age difference"). Thus, *Grosjean* essentially created a zone of discretion in age-discrimination cases involving replacement by a person who is between six and ten years younger than the plaintiff.

*Blizzard*, 698 F.3d at 284.

Plaintiffs allege that they were "replaced" and Otis responds that Plaintiffs' job duties were "assumed" by other Otis mechanics.  Even assuming Plaintiffs' allegation that they were "replaced," three of the six Plaintiffs have failed to establish that they were replaced by significantly younger workers.  Plaintiff Ray Anderson (DOB 4/7/1956) was replaced by Matt Cole (DOB 4/14/61).[18] This five year age difference is not significant enough, as a matter of law, to meet the fourth prong of a *prima facie* claim of age discrimination under even the less stringent standard applicable in non-RIF cases.  Plaintiff Ralph Brown (DOB 4/13/58) was replaced by Roy England (DOB 11/28/62).

---

[18] Plaintiffs suggest that Anderson was replaced by Ron Nanney (DOB 8/6/70), but it is undisputed that Nanney only held the position temporarily and that ultimately Matt Cole assumed Anderson's job duties.  *See Blizzard*, 698 F.3d at 284 (finding that "plaintiff's replacement was the person who was hired eventually, rather than the co-worker who assumed the job initially") (internal quotation marks, citation and alterations omitted).

This four year age difference is not significant enough, as a matter of law, to meet the fourth prong of a *prima facie* claim of age discrimination under even the less stringent standard applicable in non-RIF cases. Plaintiff Anton Wolf, (DOB 12/26/56) was replaced by the efforts of a combination of Otis mechanics, Bert Thompson (age 42), Ed Bezy (age 50) and Mike McNally (age 41). Significantly, there is no dispute that Mr. Wolf's duties were assumed by three existing employees which is not by any definition a "replacement." This is reason enough to conclude under *Barnes* that he has failed to state a *prima facie* case. In any event, the three employees who assumed his duties were not "substantially younger." Averaging the ages of the three (for an age of 44), Wolf was replaced by someone seven years his junior. Given the facts of Wolf's termination, i.e. that one of the mechanics who replaced Wolf was actually older than Wolf, the Court concludes that this seven year age difference is not significant enough, as a matter of law, to meet the fourth prong of a *prima facie* claim of age discrimination under even the less stringent standard applicable in non-RIF cases. Plaintiffs Anderson, Brown and Wolf fail to state a *prima facie* case as they cannot demonstrate, even under the less exacting non-RIF fourth prong, that they were replaced by a significantly younger worker. The Court GRANTS Otis's motion for summary judgment as to these three Plaintiffs on this separate and independent basis.[19]

---

[19] Plaintiffs' counsel also conceded at the hearing that Wolf's Title VII claim is time barred. (Hr'g Tr. 39-40.) Wolf's claim under the ELCRA is analyzed under the same legal standard as the other Plaintiffs' Title VII claims and is dismissed for the reasons articulated herein.

3.      **Otis has offered evidence of a legitimate business need in late 2008 and early 2009 to reduce its workforce and Plaintiffs have failed to produce evidence of pretext.**

Even assuming that Plaintiffs have stated a *prima facie* case of age discrimination, Otis has proffered unrebutted evidence that it was faced with an economic need to reduce its labor force and that it terminated 17 of its 72 mechanics between January, 2008 and November, 2009 (along with many non-mechanic terminations not involved in this case, ultimately reducing its workforce by 30%) pursuant to that RIF. It is undisputed that Plaintiffs were terminated, along with 11 other mechanics, during this time frame. The burden is therefore upon Plaintiffs to demonstrate that Otis's RIF was simply a pretext or a scheme to conceal age discrimination. "For a plaintiff to show pretext, he must show that the employer's given reason for its conduct 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct.'" *Lefevers*, 667 F.3d at 725 (quoting *Schoonmaker*, 595 F.3d at 268).

As the Sixth Circuit noted in *Barnes*, even if statistics are sufficient to sustain a plaintiff's *prima facie* case, statistics alone cannot serve to demonstrate pretext where "the statistics [] do not tend to establish that age played a factor in any *particular* decision." *Barnes*, 896 F.2d at 1469 (emphasis in original). "Statistics [] cannot entirely rule out the possibility that chance caused the disparity. Nor can statistics determine, if chance is an unlikely explanation, whether the more probable cause was intentional discrimination or a legitimate nondiscriminatory factor in the selection process." *Barnes*, 896 F.2d 1469 n. 21. Plaintiffs' "statistics" are insufficient to demonstrate that Otis's decision to carry out a reduction in force using the Rack and Stack rankings as a tool was a pretext for discrimination, either as to the group as a whole or on an individual basis.

The Sixth Circuit has cautioned that the "three-part" pretext inquiry not be formalistically

employed so that the Court loses sight of the essence of the pretext inquiry at the summary judgment

stage, i.e. "did the employer fire the employee for the stated reason or not."  In *Chen v. Dow*

*Chemical Co.*, 580 F.3d 394 (6th Cir. 2009), the Sixth Circuit summarized the inquiry as follows:

> Because this three-part test has recently been the subject of some potent criticism,
> *see Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006), we pause to note
> that it is important to avoid formalism in its application, lest one lose the forest for
> the trees. Pretext is a commonsense inquiry: did the employer fire the employee for
> the stated reason or not? This requires a court to ask whether the plaintiff has
> produced evidence that casts doubt on the employer's explanation, and, if so, how
> strong it is. One can distill the inquiry into a number of component parts, and it can
> be useful to do so. But that should not cause one to lose sight of the fact that at
> bottom the question is always whether the employer made up its stated reason to
> conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,
> 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[A] reason cannot be proved to be
> 'a pretext for discrimination' unless it is shown both that the reason was false, and
> that discrimination was the real reason."); *Forrester*, 453 F.3d at 417 ("If [the
> proffered reason] is not the true ground, the employer may still be innocent of
> discrimination; he may for example have lied to conceal a reason that was
> discreditable but not discriminatory.") (citations omitted). At the summary judgment
> stage, the issue is whether the plaintiff has produced evidence from which a jury
> could reasonably doubt the employer's explanation. If so, her *prima facie* case is
> sufficient to support an inference of discrimination at trial. *Hicks*, 509 U.S. at 511,
> 113 S.Ct. 2742. But summary judgment is proper if, based on the evidence presented,
> a jury could not reasonably doubt the employer's explanation. *See Reeves v.
> Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d
> 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the
> record conclusively revealed some other, nondiscriminatory reason for the
> employer's decision, or if the plaintiff created only a weak issue of fact as to whether
> the employer's reason was untrue and there was abundant and uncontroverted
> independent evidence that no discrimination had occurred.").

580 F.3d at 400 n. 4.

Analyzing Plaintiffs' proffered pretext evidence with these guidelines in mind, the Court

concludes that Plaintiffs have created at best a "weak issue of fact as to whether [Otis's] reason is

untrue and there [is] abundant and uncontroverted independent evidence that no discrimination has

occurred."  *Chen*, 580 F.3d at 400 n. 4.

**a.** **Plaintiffs have not proffered evidence that Otis's actions lacked a basis in fact.**

As in *Lefevers*, there are "substantial uncontroverted facts supporting the assertion that [Otis] was undergoing a reduction in force . . . ." *Lefevers*, 667 F.3d at 725. There is no dispute that between January 2009 and June 30, 2010, Otis laid off 17 of its 72 mechanics, six of whom were the Plaintiffs in this action. There were 72 mechanics on the 2009 Rack and Stack and 53 on June 10, 2010 (Pls.' Resp. Ex. O). While Plaintiffs assert that the number of mechanics on the routes that Plaintiffs worked did not actually decrease, they have not disputed, and cannot dispute, the fact that the company did layoff 17 mechanics overall during the time that Plaintiffs were laid off. They have produced no evidence "of evidentiary quality" to contradict the overall decrease in the number of mechanics. It is, therefore, "undisputed that an economically motivated RIF was taking place when [Otis] decided to discharge [these Plaintiffs]." *Brocklehurst*, 123 F.3d at 897.

Plaintiffs suggest that the RIF had no basis in fact because Otis ultimately rehired some mechanics and hired new mechanics in the months and years following the Plaintiffs' terminations. Plaintiffs fail to suggest, however, how this evidence bears on the economic basis for a reduction in force in late 2008 and early 2009. Plaintiffs present no evidence regarding Otis's business needs at the time that any subsequent hiring decisions may have been made, nor a single indication of the jobs that those rehires and new hires were hired to perform. It is undisputed that Otis was under no obligation, contractual or otherwise, to offer employees laid off for lack of work re-employment. Plaintiffs concede this in their response, *see* Pls.' Resp. 10 n. 29, and counsel for Otis confirmed that this was the case at the hearing on this matter:

> The Court:          And in this case the union contract did not require that if they
>                     were going to callback people or bring back new individuals
>                     in 2009 or 2010 to replace these individuals, the people laid
>                     off, they did not have a right to return to the job.

69

Ms. McCardle:          That's correct, Your Honor.

Hr'g Tr. 6-7.

Evidence regarding hires and rehires in the months and years following Plaintiffs' lay offs is of no probative force whatsoever regarding the circumstances and motivations behind the Plaintiffs' terminations in early 2009, in response to an undisputed economic downturn in the elevator business and an inability of the Detroit Otis office to meet its performance to plan to goals. That Otis may subsequently have been awarded new contracts, or recovered to some extent from the financial challenges it faced in the Detroit market in 2008 and 2009, necessitating the rehiring or hiring additional mechanics, does not tend to indicate that the decision to select 17 mechanics for layoff in early 2009 to achieve cost savings lacked any basis in fact.

> **b.**   **Plaintiffs have not produced evidence that the RIF, and the Plaintiffs' rankings on the Rack and Stack, did not actually motivate the decision to select the Plaintiffs for lay off.**

Plaintiffs argue that the 2009 Rack and Stack was manipulated to mask the true underlying reason that they were chosen for termination, i.e. their age.  Plaintiffs endeavor to show pretext by suggesting that the 2009 Rack and Stack was altered or rigged to rank older employees (whom Plaintiffs infer would have had higher Rack and Stack rankings had their FAPE values been directly translated onto the Rack and Stack) lower than their younger counterparts.  Even assuming the values on Plaintiffs' stricken Exhibit U are correct, the data fails to provide statistically sound support for the conclusions that Plaintiff urges the Court to draw.  As discussed *supra*, (*see* Section III(A)(2)(b)(i)) the disparities between the mechanic's FAPE scores and their scores on the Rack and Stack do not actually demonstrate any ageist pattern.

Plaintiffs argue that the supervisors all testified that they would directly transpose the

70

numbers from their FAPEs onto the Rack and Stack and that the two matched in every case.  As discussed *supra*, the evidence simply does not support this claim.  In fact, without exception, the Otis witnesses testified that during the Rack and Stack meeting, changes could be and were made to the values based on the collective opinion of the group.  Phil Davis testified that he did not fill out the FAPEs until *after* the Rack and Stack meeting and that the values were inherently not a perfect match because the FAPEs did not utilize numerical values and the Rack and Stack did.  Davis testified that they were supposed to match but that during the meeting discussions occurred and point differentials, a half or one point, did occur.  Keith Hearns testified that the FAPEs "loosely informed" the Rack and Stack and that there was no "change" in the numbers because the FAPEs didn't utilize numeric values, which were first assigned on the Rack and Stack.  Hearns testified that once the rankings were in place, there would be discussion at the meeting and changes would be made if there was enough agreement.  Paul Jellison testified that changes in the FAPE scores based upon discussion at the Rack and Stack meeting sometimes would occur that would result in a different evaluation on the Rack and Stack.  Greg Testolin testified that it was important that the numbers match and that the "goal" was that the FAPE and the Rack and Stack be parallel.  Testolin testified that his personal FAPE numbers could be changed by the group in this fashion but that his numbers "rarely" were changed.  Moreover, the "Paint One Picture" program that Plaintiffs put forth as evidence that the FAPEs and the Rack and Stack were supposed to be identical was put into place *after* the 2009 Rack and Stack was prepared.  Betsy Ceriello testified that the 2009 Rack and Stack was the first time that the Rack and Stack had been prepared across departments, with the input from supervisors from all departments, and that disparities may have been greater simply because the cross-departmental ranking was so new to the supervisors.

71

In short, Plaintiffs' claim that the FAPEs and the Rack and Stack matched identically at the close of the January 21, 2009 Rack and Stack meeting, and that Joe Steger went back into the document some time after the meeting and manipulated the numbers to target older workers creates at best a hypothetical question, not based on fact, in the face of abundant and uncontroverted testimony that changes were made during the Rack and Stack meeting. *See Chen*, 580 F.3d at 400 n. 4. But even assuming that an issue of fact exists as to whether this mysterious manipulation in fact occurred, this factual dispute is immaterial to the Plaintiffs' age discriminations claims because the disparities exist randomly among all age groups and skill levels, the young, the old, the high performers and the low performers. Contrary to Plaintiffs' unsupported assertion otherwise, as the Court demonstrated *supra*, the claim that older workers in general were disproportionately downgraded on the Rack and Stack is simply not borne out by the evidence. Again, by way of illustration, even assuming the values on Plaintiffs' stricken Exhibit U are correct, Dirk Knebler, Yves Levesque, Dan Schipinski and J. Smith all have disparities larger than Plaintiffs Wright (born in 1950 and 28.5 disparity points) and J. Lardner (1956 and 9.5 - J. Lardner, one of the oldest employees, only had a disparity of 9.5 points, among the smallest of any of the employees) yet Knebler, Schipinski and Smith all are younger by anywhere from 21 to 15 years than those two Plaintiffs. And between Plaintiffs Wright and J. Lardner, multiple younger employees had similar disparities in their FAPE and Rack and Stack scores, i.e. Roy England (1962 and 24.5), Ken Bazner (1966 and 23), Adam Tengler (1970 and 22), Mark Sieweke (1963 and 21.5), D. Smith (1966 and 20). And the other end of the scale, i.e. those with the lowest disparity points, provides no greater support for Plaintiffs' suggested inference of discrimination - JP Lagaeuex (born in 1940 and only 4 disparity points), Larry Kubert (born in 1949 and only 9.5 disparity points), Kevin Frush (born in

1952 and only 5 disparity points), John Avery (1955 and +1), R. Wingert (1954 and +3), John Frank (1953 and 4).

In sum, despite a professed goal to keep the FAPE values and Rack and Stack scores close, there were disparities between the FAPEs and the 2009 Rack and Stack among the old, the middle-aged and the young.  Lagaeuex, Kubert and Kevin Frush (the oldest mechanics) all score in the top 25 performers and had very low disparities. If Steger manipulated the 2009 Rack and Stack after the meeting with the supervisors, as Plaintiffs suggest, then Steger manipulated the scores based on some criteria other than age because the largest disparities are not in fact singularly present among the older mechanics, not by a long shot.  Although Plaintiffs Brown and Anderson do stand out as having the highest disparities, the absence of any ageist pattern overall in the disparities precludes any ageist inference as to these two.  There is simply no inference that a reasonable juror could draw from Plaintiffs' statistical evidence that would suggest that Brown and Anderson's ages, as opposed to some other (perhaps discreditable but not discrminatory) reason, were the basis for their discharge.      Additionally, uncontroverted evidence that Otis retained several employees near or above the Plaintiffs' ages suggests that the stated reason (a RIF and the Rack and Stack) was the true reason.  *Lefevers*, 667 F.3d at 726 (finding no inference of discrimination where those retained were also members of the protected group).  Roy England (DOB 11/28/62), O. Asmat (DOB 4/16/52), Warren Morche (DOB 5/19/45), R. Wingert (DOB 11/19/54), M. Cole (DOB 4/14/61), Kerry Kimlin (DOB 4/17/61) all were retained.  It also merits mention that the oldest mechanics (50 years and older) were dispersed among the mechanic population - among the top one-third of performers on the 2009 Rack and Stack (those least at risk of being selected for layoff), ten were over the age of 50; of the middle one-third of performers on the 2009 Rack and Stack, seven were over the age of

50 and among the bottom one-third of performers (those most at risk of being selected for layoff, the Plaintiffs among them), 13 were over the age of 50.

If in fact Steger manipulated the 2009 Rack and Stack to target older mechanics, he certainly planned a master cover up by also manipulating the scores of the younger and middle aged workers to cover his tracks. This "mystery" of the disparities, as Plaintiffs describe it, cannot be the basis on which a jury may infer discriminatory intent or finds pretext. Without some additional evidence (other than the sheer speculation that Steger manufactured a computer crash to hide the metadata on the Rack and Stack, a claim that Plaintiffs have failed to support with evidence sufficient to create a question of fact) no reasonable juror could conclude that the alleged disparities between the Rack and Stack and the FAPEs evidence an intent to target older workers for lay off. There is unquestionably evidence that Otis's first cross-departmental effort at the Rack and Stack in 2009, pursuant to which all Plaintiffs but Wolf were terminated, was imperfectly done and that subsequently efforts were made to "paint one picture" of an employee's performance. What is lacking is evidence sufficient to permit a reasonable juror to conclude that this imperfection in 2009 was targeted to disproportionately affect older workers.

   c.   **Plaintiffs have not offered evidence that the RIF, coupled with the Rack and Stack, was insufficient to motivate the Plaintiffs' selection for lay off.**

"Generally, a reduction in force, coupled with a poor performance review, is not an insufficient reason to motivate the challenged conduct." *Lefevers*, 667 F.3d at 726. Although none of the Plaintiffs was fired for poor performance, there is no dispute that the Rack and Stacks ranked them among the lowest performing mechanics. While Plaintiffs question the integrity of the 2009 Rack and Stack, they have failed to create a genuine issue of material fact regarding whether the Rack and Stack was in fact age-neutral and therefore was a legitimate tool for ranking the

74

mechanics. Plaintiffs' rankings in the bottom 25 of the 72 mechanics, coupled with Otis's decision to execute a RIF, is not an insufficient basis on which to base the termination decisions. Where Otis deviated from the Rack and Stack, it provided its exact reasons for doing so, which Plaintiffs have failed to rebut. (Def.'s Mot. Ex. 2, Steger Decl; *see infra* discussion regarding additional pretext evidence as to the individual Plaintiffs.)

Plaintiffs have failed to produce sufficient evidence to permit a reasonable juror to conclude that Otis's legitimate business reasons given for selecting the Plaintiffs for lay off was not really the true reason for their terminations.

### 4.    Evidence of pretext as to the individual Plaintiffs

"While the Plaintiffs as a group cannot demonstrate facts sufficient to allow a finding of pretext," the Court must also consider whether the "individual Plaintiffs have presented enough evidence to allow a finding of pretext." *Barnes*, 896 F.2d at 1470. The Court thus examines evidence that may be particular to Plaintiffs E. Lardner, J. Lardner or Richard Wright that may be sufficient to demonstrate that, as to any one of them, sufficient evidence of pretext has been shown.[20]

#### a.    Earl Lardner

Earl Lardner (DOB 5/2/52, age 57 at termination) worked a somewhat rural maintenance route for Otis and was terminated on August 20, 2009. (Def.'s Mot. Ex. 5, E. Lardner Dep. 18.) Earl Lardner's duties were assumed by Ed Idyle (DOB 5/8/66), a longtime Otis employee who was working for Otis at the time that Earl Lardner was terminated. Mr. Idyle ranked 45 places higher

---

[20] Because the Court has concluded that Plaintiffs Anderson, Brown and Wolf have failed to create a genuine issue of fact that they were replaced by a significantly younger person even under the less-exacting *prima facie* standard applicable in a non-RIF case, the Court need not analyze the issue of individual pretext as to any one of them. They have failed as a matter of law to state a *prima facie* case of age discrimination.

than Earl Lardner on the 2009 Rack and Stack.  Ed Testilon, Earl Lardner's supervisor at the time

of his lay off, testified that Mr. Idyle was "a long term Otis employee" who "had a previous

maintenance route in the Southfield area" before assuming Earl Lardner's route.  (Def.'s Mot. Ex.

13, Testilon Dep. 116-17.)

Earl Lardner claims that Mr. Idyle was less qualified than he and "much less experienced."

(Def.'s Mot. Ex. 5, E. Lardner Dep. 30.)  In support of his claim regarding Mr. Idyle's qualifications

and experience, Plaintiffs offer Mr. Lardner's qualifications, i.e. he holds a Bachelor of Science as

well as Michigan and Detroit Journeyman licenses and was a journeyman for about 25 years at the

time of his layoff.  Plaintiffs offer no evidence, however, other than Mr. Lardner's opinion and any

inference that may be drawn from Mr. Idyle's age, that Mr. Idyle was "much less experienced."

Even assuming that Mr. Lardner was "replaced" by Mr. Idyle (Otis claims that Mr. Idyle "assumed"

E. Lardner's duties and did not replace him), Mr. Lardner's unsupported opinion that Mr. Idyle was

less qualified cannot suffice to create a genuine issue of fact.  "A plaintiff's subjective view of his

qualifications in relation to other [employees], without more, fails to establish discrimination."

*Schoonmaker*, 595 F.3d at 269 (citation omitted).  Not unimportantly, Mr. Idyle ranked significantly

higher that Earl Lardner on the 2009 Rack and Stack.  There is no evidence creating a genuine issue

of material fact regarding the relative qualifications of Earl Lardner and Ed Idyle to perform the

relevant maintenance route.

Earl Lardner testified that his supervisor, Greg Testilon, was close in age to Mr. Lardner and

never suggested to Mr. Lardner that he was too old or physically incapable of doing his job.  (Def.'s

Mot. Ex. 5, E. Lardner Dep. 32.)  Greg Testilon testified that he participated in Earl Lardner's lay

off to the extent that he prepared the FAPE which was used to enter scores on the 2009 Rack and

76

Stack and he participated in the 2009 Rack and Stack meeting.  (Def.'s Mot. Ex. 13, Testilon Dep. 80-81.)  Mr. Testilon testified that his recollection was that his FAPE scores for Earl Lardner were the scores that were entered on the 2009 Rack and Stack:

> Q:   Okay. And your testimony is also that to the extent that you would have participated in that rack and stack, you would have truly used the FAPE, the field association performance evaluation scores, and they would have been entered into the rack and stack.
>
> A:   Yes, ma'am.  That's correct.
>
> Q:   And it's your recollection, at least, that that wasn't changed much, at least not in that room at that time.
>
> A:   That is correct.

(Testilon Dep. 81.)  As a comparison of Earl Lardner's 2009 FAPE and his scores on the 2009 Rack and Stack demonstrates, Earl Lardner's FAPE scores in fact were different (higher by a full point on eight factors) than his 2009 Rack and Stack scores.   Earl Lardner was among the mechanics with the greatest disparity between his FAPE scores and his 2009 Rack and Stack scores.  Mr. Lardner's 2009 Rack and Stack score was also increased, however, one full point on one performance factor, ethics.  Either Mr. Testilon's recollection is mistaken or the 2009 Rack and Stack scores for Earl Lardner were changed some time after the 2009 Rack and Stack meeting.  Joe Steger, whom all the evidence suggests was the keeper of the Rack and Stack document and who was the only individual with the ability to have adjusted the Rack and Stack scores after the 2009 Rack and Stack meeting, testified that he went back into the document once to make a note about Bob Shumaker but never went back in to make adjustments other than that one time.  (Def.'s Mot. Ex. 1, Steger Dep. 227-28.)  Mr. Steger later testified that as the keeper of the Rack and Stack he would have been the one who made the note on the Rack and Stack indicating that Plaintiff Ray Anderson had been "retained due

to race on January 21, 2009," although he did not recall having done so.[21]  (*Id*. at 238-39.)  Mr. Steger testified that the FAPEs and the Rack and Stack scores were arrived at through completely different processes but should in the end be "similar" or "close."  (Steger Dep. at 184, 221.)  When presented with the disparities between certain FAPEs and Rack and Stack scores at his deposition, Mr. Steger "did not have an answer" for the discrepancies.  (*Id*. at 200.)  Mr. Steger testified that the Rack and Stack was considered in making a decision as to which mechanic should be laid off but that the process was somewhat discretionary and they looked at "the lowest population."  (*Id*. at 229-30.)

Had Earl Lardner's FAPE scores been exactly transposed onto the 2009 Rack and Stack, his score would have been 205.5, which would have put him just before James Lardner on the Rack and Stack and thus still among the bottom 25 mechanics and still at risk of lay off during the 2009 RIF.  (ECF No. 84, p. 7.)  Had Earl Lardner's FAPE scores been adjusted more in keeping with many other mechanics both above and below his age, an average adjustment would have put his Rack and Stack score at 185.5, which would have put Earl Lardner two spots higher on the 2009 Rack and Stack, just before Plaintiff Ralph Brown.

Joe Steger testified in his Declaration that he selected Earl Lardner for lay off based on the 2009 Rack and Stack, Otis's business needs, and information he had learned during weekly manager meetings regarding mechanic's performance and skills.  (ECF No. 55-1, Steger Decl. ¶ 22.)  Given the other lay offs that had occurred in 2009, Earl Lardner was the fourth lowest ranked mechanic on the 2009 Rack and Stack remaining in Detroit.  (*Id*.)  The three lower ranked mechanics were co-

---

[21] This is consistent with Betsy Cereillo's testimony that she instructed Steger to pass over Ray Anderson (African American) once or twice when he came up for lay off in part because Otis wanted to try to promote diversity in the work force.  (Def.'s Mot. Ex. 16, Ceriello Dep. 142-43.)

Plaintiff Richard Wright, Dan Schipinski and Roy England.  Mr. Steger made the decision to retain Schipinski over Earl Lardner based on Schipinski's specialized skill in cab modernization, Roy England because of a customer request and Mr. Wright to avoid further disruption at the airport where several other lay offs had already occurred.  (*Id.*)  Plaintiff Earl Lardner has not disputed the business reasons given by Mr. Steger in his Declaration but claims that Earl Lardner would not have been in line for lay off, i.e. he would not have been the fourth lowest ranked mechanic but would have been ranked higher, had his Rack and Stack score accurately reflected his FAPE score.

It is a closer case as to whether Earl Lardner has presented sufficient evidence to permit a reasonable juror could conclude that that the Rack and Stack scores were used as a guise to terminate him due to his age.  There is no dispute that eight of Earl Lardner's performance factors were lowered by a full point.  Two were lowered by a half-point.  What distinguishes Earl Lardner's case from the other Plaintiffs is that Earl Lardner's supervisor specifcally recalled that his FAPE scores for Mr. Lardner were directly translated onto the 2009 Rack and Stack.  Notably, however, the failure of the FAPEs and Rack and Stack scores to align was seen through all age categories and, by way of example, Jim Smith (DOB 1965, 13 years younger than Earl Lardner), also suffered a lower score on the 2009 Rack and Stack by one full point on eight performance factors. As discussed *supra*, Plaintiffs have failed to support a claim that the 2009 Rack and Stack, viewed as a whole, was manipulated to target older workers for lay off.  There are simply too many instances where younger workers also had their scores significantly lowered for reasons that remain equally unexplained.  But as to Earl Lardner, whose scores were lowered to a significantly greater degree than the average disparity, and whose supervisor recalls that his FAPE scores directly corresponded with his Rack and Stack scores, could reasonable jurors conclude that in his case, the Rack and Stack was

manipulated to target him for lay off due to his age?  The problem is that there is no evidence other than the disparity itself that would suggest that Earl Lardner's age, as opposed to some other characteristic about him, may have been the reason for the harsher treatment in his case.  Notably, at the time that Earl Lardner was laid off, Otis had already laid off 12 other mechanics, all of whom were younger than Earl Lardner.  (ECF No. 71, Excerpt of Otis's EEOC Statement for Earl Lardner.) Perhaps a reasonable juror could conclude that Joe Steger did go in and change the Rack and Stack scores and perhaps a reasonable juror could conclude that Steger did target Earl Lardner, but is there enough evidence for a jury reasonably to conclude that Steger did so because Earl Lardner was 57 years old and not for some other reason unrelated to his age, particularly when Otis retained some employees who in fact were older than Earl Lardner?  Given the lack of additional circumstantial evidence of age discrimination in this case, the Court concludes that no reasonable juror could conclude that Earl Lardner was selected out and targeted for discharge because of his age.

**b.    James Lardner**

James Lardner (DOB 3/2/56, 53 at the time of termination) was terminated on October 9, 2009.  His job duties on his maintenance route at Sinai-Grace were assumed (Plaintiffs say he was "replaced") by Bryan Morche (DOB 8/26/71) and subsequently by Cliff Tomlin (DOB 1955). (Def.'s Mot. Ex. 6, J. Lardner Dep. 9, 32, 57-59.)  James Lardner testified to his belief that Bryan Morche was not as qualified as Lardner on the equipment that Lardner worked and that Morche often called him (Lardner) for help with troubleshooting.  (*Id*. at 57-58.)   Other than his opinion of Morche's qualifications, and evidence regarding James Lardner's own qualifications as having taken some college courses and having Detroit and Michigan journeyman's licenses, Plaintiffs offer Morche's FAPEs as evidence that he was less qualified than Lardner.  (ECF No. 72, Pls.' Resp. Ex.

G, 16-18, Morche 2010 FAPE.)  The supervisor comments in Morche's 2010 FAPE indicate that he is "the go to guy" with escalators, has an excellent attitude toward quality and customer needs, always responds to change with limited resistance, is mechanically inclined and sometimes "struggles with electrical repairs and troubleshooting."  (*Id*.)  James Lardner did not have any information or opinion regarding Cliff Tomlin's qualifications to perform Lardner's job duties.  (*Id*. at 60.)  *See Schoonmaker*, 595 F.3d at 266 (requiring objective evidence of relative qualifications "as measured by objective, company-established criteria" even to demonstrate a *prima facie* case).

Paul Jellison, James Lardner's supervisor, testified that James Lardner was selected for lay off due to a consolidation of routes.  (ECF No. 12, Jellison Dep. 33-34.)  Joe Steger testified that he selected James Lardner for lay off because he was the fourth lowest ranked mechanic at the time Olney requested that Steger reduce the number of mechanics again.  (ECF No. 55, Steger Decl. ¶ 23.)  Steger testified that he retained three lower ranked mechanics, Yves Levesque, Dan Schipinski and Roy England due to Levesque's experience on the APM at the airport, Schipinski's specialized skill in cab modernization and England because of a customer request.  (*Id.*)  Plaintiffs do not contest any of these reasons given by Steger for deviating from the strict order of the 2009 Rack and Stack in selecting James Lardner for lay off.  In fact, James Lardner was called back after his termination to work on a specific service project in Bay City.  (J. Lardner Dep. 9.)

Unlike the large disparity between Earl Lardner's FAPE and Rack and Stack scores, James Lardner had one of the smallest disparities of any of the 72 mechanics on the Rack and Stack.  Thus, there is no evidence that would in any way distinguish his case from any other of the mechanics, most of whom were younger than he, whose scores were adjusted even more drastically.  Moreover, it is undisputed that his route was ultimately taken over by a mechanic who was one year older than

Lardner. There is simply no evidence on which a reasonable juror could conclude that the RIF and the Rack and Stack were a pretext used to select James Lardner for lay off because of his age.

### c.     Richard Wright

Richard Wright (DOB 12/26/50) was terminated on September 9, 2009 from his position principally assigned to the DTW doing traditional service work (elevators, escalators, moving sidewalks) with some experience with the control panel on the APM. (Def.'s Mot. Ex. 8, Wright Dep. 17-18, 23-26, 59-60.) As an initial matter, the Court notes that Mr. Wright has failed to address Otis's argument that Mr. Wright's age (as well as his race) discrimination claim fails for the fundamental fact that he admits that his supervisor, Phil Davis, who selected him for lay off, never discriminated against him on the basis of his age (or his race). (Wright Dep. 31-32.)

Wright was selected for lay off by his supervisor, Phil Davis, who testified that he selected Wright, with Joe Steger's input and approval, because he was the lowest ranking airport mechanic at the time of his lay off. (ECF No. 14, Davis Decl. ¶ 16.) Davis testified that Wright's lay off was necessary because there was a surplus of mechanics at the DTW after Otis had reassigned Kirk Rosiek (Age 42) to the APM at the DTW "given his skill set and recent completion of a modernization assignment." (*Id.* ¶ 15.) Rosiek's reassignment resulted in the need to transfer Yves Levesque (Age 45) from the APM to traditional service work at the airport, creating the surplus of mechanics that led to Richard Wright's lay off. (*Id.* ¶ 16; ECF No. 75, Otis's EEOC Statement Regarding Wright.) Plaintiffs assert that Rosiek replaced Wright and was less qualified than Wright because Rosiek was new to the APM and had to "learn" to do the work. Plaintiffs offer no evidence to establish that Wright's qualifications were superior to Rosiek's in any meaningful respect. Mr. Wright was the lowest ranking mechanic on the Rack and Stack at the time of his discharge and

there was a surplus of mechanics doing traditional work at the airport. The Rack and Stack was consulted and Wright was selected. Wright has produced insufficient evidence from which a reasonable juror could conclude that the RIF and Rack and Stack were a pretext used to select him for lay off because of his age.

**B.     Plaintiffs Anderson and Wright's Race Discrimination Claims**

To withstand summary judgment on a race discrimination claim, plaintiff must present "either direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory intent." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). If direct evidence is not presented, plaintiff must proceed under the same *McDonnell Douglas* burden shifting framework applicable in the age discrimination context discussed *supra* at IIIA1. Additionally, as in the context of an age discrimination claim, if the plaintiff was terminated in the context of a RIF, plaintiff must satisfy the *Barnes* heightened pleading standard at the *prima facie* stage. *See supra* discussion at (III)(A)(2).

As evidence in support of their race discrimination claims, Anderson and Wright offer the following evidence:

- James Lardner testified that he witnessed Joe Steger comment that he did not want black people working for him. Lardner testified that Steger was laying off a black helper sometime in 2002 named Van Wiley but in fact was supposed to lay off another worker who was not black. Lardner testified that Steger told him that was "all right because I don't want any blacks working for me." (J. Lardner Dep. at 73-76.)

- Greg Testilon made general racial slurs, not about Otis employees. (E. Lardner Dep. 40).

- Wright testified that once a temporary helper at Otis stated to Mr. Wright that he did not have to take orders from a "nigger." (*Id*. at 35.)

- Hearns told Ray Anderson that "the white man is great as long as you make money

for him and I'm in it for the money."

Plaintiffs argue that Joe Steger's comment in 2002 about not wanting black people to work for him constitutes direct evidence of racial discrimination. The Court disagrees. "'[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . . of demonstrating animus.'" *Lefevers*, 667 F.3d at 724. Evidence of one remark allegedly made seven years before the adverse employment action being challenged cannot serve as direct evidence of discrimination. *See Jinks v. AlliedSignal, Inc.*, 250 F.3d 381, 388 (6th Cir. 2001) (doubting that "a single, isolated comment or belief that one member of management held several years prior to [plaintiffs'] layoff is sufficient direct evidence" of discrimination.) Thus, Plaintiffs Anderson and Wright must proceed on the basis of circumstantial evidence, first making out a *prima facie* case, on their race discrimination claim. Additionally, if (as the Court concluded above) there is no genuine issue of material fact that Otis laid off the Plaintiffs pursuant to a RIF, in addition to proving to the standard fourth prong of a *prima facie* case of race discrimination, Plaintiffs must offer additional direct, circumstantial or statistical evidence that they were singled out for termination because of their race.

Anderson and Wright cannot meet their heightened *prima facie* burden under *Barnes*. Hearns's statements about "the white man," Testolin's unspecified "racial slurs," and some unidentified "helper's" remark about not taking orders from a "nigger," are too "isolated and ambiguous" to serve as additional circumstantial evidence of Otis's discriminatory intent. *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993). Steger's statement made seven years earlier is too remote to bear on a decision that was made in 2009. Additionally, neither Steger's nor the unidentified "helper's" allegedly racial comments suffice to demonstrate animus. "'[S]tatements

by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . . of demonstrating animus.'" *Lefevers*, 667 F.3d at 724. "'Evidence of discriminatory motives must . . . have some relationship with the employment decision in question; inappropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not do.'" *Naboychik v. Salix Pharmaceuticals, Inc.*, No. 10-10521, 2011 WL 4498821 at *5 (E.D. Mich. Aug. 8, 2011). Additionally, Anderson testified that the racial remark attributed to Steger was never brought to his attention at the time it was allegedly uttered but rather was not disclosed to him until the Plaintiffs started this lawsuit. (Def.'s Mot. Ex. 3, Anderson Dep. 58.)

While Steger was involved in the decisions to lay off the two African Americans, Anderson and Wright, his allegedly racial remark was made in 2002, seven years before the 2009 lay offs. (Def.'s Mot. Ex. 6, J. Lardner Dep. 73-76.) There is no evidence that his statement was in any way "related to the decisional process" that took place in 2009. Moreover, it is undisputed that Phil Davis, as to whom no discriminatory animus, racial or ageist, has been charged, was the individual who selected Richard Wright for lay off, with Steger's approval. (Def.'s Mot. Ex. 8, Wright Dep. 31; Def.'s Mot. Ex. 14, Davis Decl. ¶ 16.)

Anderson was terminated by his supervisor, Keith Hearns, who was also African American and was the same age as Anderson. Hearns testified that he was informed in a "standing Friday meeting" that Anderson one was one of the individuals who had been chosen for lay off. (Def.'s Mot. Ex. 11, Hearns Dep. 144.) Hearns testified that he was not specifically informed of how the decision was reached to terminate Anderson but he assumed that the decision was made based on the Rack and Stack. (*Id.*) Hearns could not recall who was present at that Friday standing meeting

85

but assumed that Steger likely communicated the decision and perhaps Rob Olney also was present. (*Id*. at 144-45.)  Hearns also testified in his deposition that he never heard Joe Steger or anyone at Otis make any racially derogatory comments or slurs.  (*Id*. at 156.)

Plaintiffs appear to complain that Otis simply does not employ enough African Americans. There is no evidence that the alleged "dearth" of African Americans among the mechanic work force is a result of discrimination.  Indeed, Plaintiff Anderson testified that to his belief that there were not many black workers in the elevator trade in general.  (*Id*. at 38-39.)  Moreover, the only evidence presented directly addressing this point suggests that Otis endeavored to retain its African American workers.  Betsy Ceriello testified that she expressly directed Joe Steger to retain Anderson when he was first recommended for lay off.  Tellingly, Wright testified that neither of his supervisors ever discriminated against him on the basis of his race.  (Def.'s Mot. Ex. 8, Wright Dep. 31.)

Even assuming that Anderson and Wright could make out a *prima facie* case, they have not adduced sufficient evidence to create a genuine issue of material fact that Otis's stated reason for their terminations was pretextual.[22]  To demonstrate pretext in their race discrimination claim, as in their age discrimination claim, Plaintiffs must show that the stated reason had no basis in fact, did not actually motivate the decision or was insufficient to motivate the decision.  *Lefevers*, 667 F.3d at 725.  "An employer is entitled to summary judgment if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Chen*, 580 F.3d at 400 n. 4 (internal

---

[22] Although the Court need not examine the *prima facie* case, it is important to note that Anderson and Wright were terminated as part of a RIF in which the remaining terminated mechanics were all Caucasian.  Thus, it surely cannot be said that similarly situated non-protected employees were treated differently.

citation and quotation marks omitted).  In the instant case, Plaintiffs have made no effort to demonstrate pretext in the context of their race discrimination claims.  They simply state that "pretext is shown, above, equally for the race claims as for the age discrimination claims."  (ECF No. 67, Pls.' Resp. 25.)  For the reasons stated *supra* as to their age discrimination claim, Otis's stated reasons have been shown to have a basis in fact, to have actually motivated the decisions to terminate the Plaintiffs and to have been sufficient to motivate the decision to terminate Wright and Anderson who were among the lowest ranked mechanics on the Rack and Stack.  While Ray Anderson had the largest disparity between his FAPE and Rack and Stack scores of all mechanics, there is simply no evidence that this disparity was related to his race.  Plaintiffs have not produced sufficient evidence on which a reasonable juror could conclude that the RIF and Rack and Stack were a guise to permit Otis to terminate Wright and Anderson on the basis of their race.

## IV.    CONCLUSION

The pivotal question the Court must ask at this summary judgment stage is whether, viewing the facts in the light most favorable to the Plaintiffs, a reasonable jury could conclude, based on the evidence presented, that the reduction in force, and the ranking system utilized by Otis to select Plaintiffs for lay off, were a guise to terminate these six Plaintiffs because of their age (and in the case of Anderson and Wright, also their race).  Did Plaintiffs produce evidence to substantiate their claim that Otis intentionally manipulated the data on the 2009 Rack and Stack to target older workers so that the Plaintiffs would be chosen for lay off before younger, less qualified workers?  The ultimate burden of persuading the trier of fact that age was the but for cause of their terminations remains at all times with the Plaintiffs.  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  For the reasons stated above, the Court concludes that Plaintiffs have

failed to meet this burden, both as to their age and race discrimination claims, and GRANTS Otis's

motion for summary judgment.

IT IS SO ORDERED.


                                                S/Paul D. Borman
                                                PAUL D. BORMAN
                                                UNITED STATES DISTRICT JUDGE

Dated:  April 12, 2013

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
April 12, 2013.


                                                S/Denise Goodine
                                                Case Manager